# LILJEBERG *v.* HEALTH SERVICES ACQUISITION CORP.

No. 86–957.   Argued December 9, 1987—Reargued April 25, 1988—
Decided June 17, 1988

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and KENNEDY, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in which WHITE and SCALIA, JJ., joined, *post*, p. 870. O'CONNOR, J., filed a dissenting opinion, *post*, p. 874.

*H. Bartow Farr III* reargued the cause for petitioner. With him on the briefs were *A. J. Schmitt, Jr.*, and *Melvin W. Mathes*.

*William M. Lucas, Jr.*, reargued the cause for respondent. With him on the briefs were *Joyce M. Dombourian, Curtis R. Boisfontaine*, and *Kathryn J. Lichtenberg.**

JUSTICE STEVENS delivered the opinion of the Court.

In 1974 Congress amended the Judicial Code "to broaden and clarify the grounds for judicial disqualification." 88 Stat. 1609. The first sentence of the amendment provides:

---

*Briefs of *amici curiae* urging affirmance were filed for Kenneth W. Davis, Jr., et al. by *Richard E. Coulson, David Kline*, and *Stephen W. Elliott;* and for NEC Corp. et al. by *Shirley M. Hufstedler*.

"Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U. S. C. § 455(a), as amended.

In the present case, the Court of Appeals for the Fifth Circuit concluded that a violation of § 455(a) is established when a reasonable person, knowing the relevant facts, would expect that a justice, judge, or magistrate knew of circumstances creating an appearance of partiality, notwithstanding a finding that the judge was not actually conscious of those circumstances. Moreover, although the judgment in question had become final, the Court of Appeals determined that under the facts of this case, the appropriate remedy was to vacate the court's judgment. We granted certiorari to consider its construction of § 455(a) as well as its remedial decision. 480 U. S. 915 (1987). We now affirm.

I

In November 1981, respondent Health Services Acquisition Corp. brought an action against petitioner John Liljeberg, Jr., seeking a declaration of ownership of a corporation known as St. Jude Hospital of Kenner, Louisiana (St. Jude). The case was tried by Judge Robert Collins, sitting without a jury. Judge Collins found for Liljeberg and, over a strong dissent, the Court of Appeals affirmed. Approximately 10 months later, respondent learned that Judge Collins had been a member of the Board of Trustees of Loyola University while Liljeberg was negotiating with Loyola to purchase a parcel of land on which to construct a hospital. The success and benefit to Loyola of these negotiations turned, in large part, on Liljeberg prevailing in the litigation before Judge Collins.

Based on this information, respondent moved pursuant to Federal Rule of Civil Procedure 60(b)(6) to vacate the judgment on the ground that Judge Collins was disqualified under § 455(a) at the time he heard the action and entered judgment

in favor of Liljeberg. Judge Collins denied the motion and respondent appealed. The Court of Appeals determined that resolution of the motion required factual findings concerning the extent and timing of Judge Collins' knowledge of Loyola's interest in the declaratory relief litigation. Accordingly, the panel reversed and remanded the matter to a different judge for such findings. App. to Pet. for Cert. 40a. On remand, the District Court found that based on his attendance at Board meetings Judge Collins had actual knowledge of Loyola's interest in St. Jude in 1980 and 1981. The court further concluded, however, that Judge Collins had forgotten about Loyola's interest by the time the declaratory judgment suit came to trial in January 1982. On March 24, 1982, Judge Collins reviewed materials sent to him by the Board to prepare for an upcoming meeting. At that time—just a few days after he had filed his opinion finding for Liljeberg and still within the 10-day period allowed for filing a motion for a new trial—Judge Collins once again obtained actual knowledge of Loyola's interest in St. Jude. Finally, the District Court found that although Judge Collins thus lacked actual knowledge during trial and prior to the filing of his opinion, the evidence nonetheless gave rise to an appearance of impropriety. However, reading the Court of Appeals' mandate as limited to the issue of actual knowledge, the District Court concluded that it was compelled to deny respondent's Rule 60(b) motion. App. to Pet. for Cert. 14a.

The Court of Appeals again reversed. The court first noted that Judge Collins should have immediately disqualified himself when his actual knowledge of Loyola's interest was renewed.[1] The court also found that regardless of Judge Collins' actual knowledge, "a reasonable observer

---

[1] Because the court concluded that the judgment should be vacated based on an appearance of impropriety that permeated the entire proceeding, it declined to decide on the appropriate remedy for a judge's failure to promptly disqualify himself after the entry of judgment but prior to expiration of the time allowed for filing certain motions.

would expect that Judge Collins would remember that Loyola had some dealings with Liljeberg and St. Jude and seek to ascertain the nature of these dealings." 796 F. 2d 796, 803 (1986). Such an appearance of impropriety, in the view of the Court of Appeals, was sufficient ground for disqualification under § 455(a). Although recognizing that caution is required in determining whether a judgment should be vacated after becoming final, the court concluded that since the appearance of partiality was convincingly established and since the motion to vacate was filed as promptly as possible, the appropriate remedy was to vacate the declaratory relief judgment. Because the issues presented largely turn on the facts as they give rise to an appearance of impropriety, it is necessary to relate the sequence and substance of these events in some detail.

II

Petitioner, John Liljeberg, Jr., is a pharmacist, a promoter, and a half-owner of Axel Realty, Inc., a real estate brokerage firm. In 1976, he became interested in a project to construct and operate a hospital in Kenner, Louisiana, a suburb of New Orleans. In addition to providing the community with needed health care facilities, he hoped to obtain a real estate commission for Axel Realty and the exclusive right to provide pharmaceutical services at the new hospital. The successful operation of such a hospital depended upon the acquisition of a "certificate of need" from the State of Louisiana; without such a certificate the hospital would not qualify for health care reimbursement payments under the federal medicare and medicaid programs.[2] Accordingly, in October 1979, Liljeberg formed St. Jude, intending to have the corporation apply for the certificate of need at an appropriate time.

---

[2] See 42 U. S. C. § 1320a–1 (1982 ed. and Supp. IV). As the Court of Appeals noted, "[w]ithout reimbursement, it is impractical (if not impossible) to operate a hospital." App. to Pet. for Cert. 58a, n. 1.

During the next two years Liljeberg engaged in serious negotiations with at least two major parties. One set of negotiations involved a proposal to purchase a large tract of land from Loyola University for use as a hospital site, coupled with a plan to rezone adjoining University property. The proposed benefits to the University included not only the proceeds of the real estate sale itself, amounting to several million dollars, but also a substantial increase in the value to the University of the rezoned adjoining property. The progress of these negotiations was regularly reported to the University's Board of Trustees by its Real Estate Committee and discussed at Board meetings. The minutes of those meetings indicate that the University's interest in the project was dependent on the issuance of the certificate of need.[3]

Liljeberg was also conducting serious negotiations with respondent's corporate predecessor, Hospital Affiliates International (HAI), a national health management company. In the summer of 1980, Liljeberg and HAI reached an agreement in principle, outlining their respective roles in de-

---

[3] The District Court found:

"Discussions of the St. Jude Hospital project are reflected in the minutes of the next meeting of the Board of Trustees on January 24, 1980, which Judge Collins attended. See Plaintiff's Exhibit 22. Liljeberg's first offer on behalf of St. Jude Properties to purchase approximately 75 acres of Loyola's Kenner property was presented in a Real Estate Committee report, which was summarized in the Board minutes. The minutes also include the response of Loyola University to Liljeberg, including the Committee's expression of interest in continuing negotiations with St. Jude Properties. The minutes further reflect the Real Estate Committee's communication to Liljeberg that 'until a certificate of need were forthcoming, Loyola would more than likely not be interested in the project.' The minutes outline the terms of a second offer received by Loyola University from St. Jude Properties raising the purchase price by $7,000.00 per acre, 'with no financing necessary and no commitments of any kind except the dedication of 110 feet for roadway purposes, with the improvement cost paid totally by the Liljeberg group.' The minutes elaborate on the details of the offer, including St. Jude Properties' desire for a sixty day period to secure financing to finalize the sale." App. to Pet. for Cert. 19a–20a.

veloping the hospital. The agreement contemplated that HAI would purchase a tract of land in Kenner (not owned by the University) and construct the hospital on that land; prepare and file the certificate of need; and retain Liljeberg as a consultant to the hospital in various capacities. In turn, it was understood that Liljeberg would transfer St. Jude to HAI. Pursuant to this preliminary agreement, various documents were executed, including an agreement by HAI to purchase the tract of land from its owner for $5 million and a further agreement by HAI to place $500,000 in escrow. In addition, it was agreed that Axel Realty, Inc., would receive a $250,000 commission for locating the property. Eventually, Liljeberg signed a "warranty and indemnity agreement," which HAI understood to transfer ownership of St. Jude to HAI. After the warranty and indemnity agreement was signed, HAI filed an application for the certificate of need.

On August 26, 1981, the certificate of need was issued and delivered to Liljeberg. He promptly advised HAI,[4] and HAI paid the real estate commission to Axel Realty. A dispute arose, however, over whether the warranty and indemnity agreement did in fact transfer ownership of St. Jude to HAI. Liljeberg contended that the transfer of ownership of St. Jude—and hence, the certificate of need—was conditioned upon reaching a final agreement concerning his continued participation in the hospital project. This contention was not supported by any written instrument. HAI denied that there was any such unwritten understanding and insisted that, by virtue of the warranty and indemnity agreement, it had been sole owner of St. Jude for over a year. The dispute gave rise to this litigation.

[4] Coincidentally, HAI was acquired by Hospital Corporation of America on August 26, 1981, through a merger of HAI and respondent, Health Services Acquisition Corporation, which is a subsidiary of Hospital Corporation of America. For convenience, we shall continue to describe this entity as HAI.

Respondent filed its complaint for declaratory judgment on November 30, 1981. The case was tried by Judge Collins, sitting without a jury, on January 21 and 22, 1982. At the close of the evidence, he announced his intended ruling, and on March 16, 1982, he filed a judgment (dated March 12, 1982) and his findings of fact and conclusions of law. He credited Liljeberg's version of oral conversations that were disputed and of critical importance in his ruling.[5]

During the period between November 30, 1981, and March 16, 1982, Judge Collins was a trustee of Loyola University, but was not conscious of the fact that the University and Liljeberg were then engaged in serious negotiations concern-

---

[5] For example, Liljeberg's attorney testified that before returning the signed copy of the warranty and indemnity agreement to HAI, he told HAI's associate corporate counsel that Liljeberg would not transfer ownership of St. Jude until they reached a binding agreement concerning Liljeberg's continued participation in the hospital project. HAI's associate corporate counsel testified that no such conversation occurred. App. to Pet. for Cert. 61a, n. 3.

Although noting this conflicting testimony, the Fifth Circuit held on appeal that Judge Collins did not abuse his discretion in awarding the certificate to Liljeberg. Judge Rubin, in dissent, pointed to another example of where Liljeberg received the benefit of the doubt on a critical disputed fact. Liljeberg's attorney received the proposed warranty and indemnity agreement from HAI under cover of a letter which stated: "I believe this is the only document . . . that would be needed in effecting the transfer." *Id.*, at 60a, n. 2. Liljeberg's attorney testified, however, that he did not read the letter of transmittal. Yet, as Judge Rubin observed:

"It is curious that a lawyer would fail to read a letter that comes to him attached to an important document. It is curiouser, as Alice said, after she had passed through the looking glass into Wonderland, that Liljeberg, who repeatedly testified that he distrusted HAI although he had contemplated entering into a complex and potentially lucrative relationship with the corporation, designed to operate over a seven-year period, did not respond to the cover letter. . . .

"It is curiouser still that [Liljeberg's attorney], who testified that he did not read the cover letter, nevertheless knew that HAI believed that the Warranty and Indemnity Agreement was sufficient to transfer 'ownership.'" *Id.*, at 75a, n. 4.

ing the Kenner hospital project, or of the further fact that the success of those negotiations depended upon his conclusion that Liljeberg controlled the certificate of need. To determine whether Judge Collins' impartiality in the Liljeberg litigation "might reasonably be questioned," it is appropriate to consider the state of his knowledge immediately before the lawsuit was filed, what happened while the case was pending before him, and what he did when he learned of the University's interest in the litigation.

After the certificate of need was issued, and Liljeberg and HAI became embroiled in their dispute, Liljeberg reopened his negotiations with the University. On October 29, 1981, the Real Estate Committee sent a written report to each of the trustees, including Judge Collins, advising them of "a significant change" concerning the proposed hospital in Kenner and stating specifically that Loyola's property had "again become a prime location." App. 72. The Committee submitted a draft of a resolution authorizing a University vice president "to continue negotiations with the developers of the St. Jude Hospital." Id., at 73. At the Board meeting on November 12, 1981, which Judge Collins attended, the trustees discussed the connection between the rezoning of Loyola's land in Kenner and the St. Jude project and adopted the Real Estate Committee's proposed resolution. Thus, Judge Collins had actual knowledge of the University's potential interest in the St. Jude hospital project in Kenner just a few days before the complaint was filed.

While the case was pending before Judge Collins, the University agreed to sell 80 acres of its land in Kenner to Liljeberg for $6,694,000. The progress of negotiations was discussed at a Board meeting on January 28, 1982. Judge Collins did not attend that meeting, but the Real Estate Committee advised the trustees that "the federal courts have determined that the certificate of need will be awarded to the St. Jude Corporation." Id., at 37. Presumably this advice was based on Judge Collins' comment at the close of the hear-

ing a week earlier, when he announced his intended ruling because he thought "it would be unfair to keep the parties in doubt as to how I feel about the case." App. to Pet. for Cert. 41a.

The formal agreement between Liljeberg and the University was apparently executed on March 19. App. 50–58. The agreement stated that it was not in any way conditioned on Liljeberg's prevailing in the litigation "pending in the U. S. District Court for the Eastern District of Louisiana . . . involving the obtaining by [Liljeberg] of a Certificate of Need," id., at 55, but it also gave the University the right to repurchase the property for the contract price if Liljeberg had not executed a satisfactory construction contract within one year and further provided for nullification of the contract in the event the rezoning of the University's adjoining land was not accomplished. Thus, the University continued to have an active interest in the outcome of the litigation because it was unlikely that Liljeberg could build the hospital if he lost control of the certificate of need; moreover, the rezoning was in turn dependent on the hospital project.[6]

---

[6] As the Court of Appeals pointed out:

"The district court's determination that Loyola's interest in the litigation terminated as of March 19, 1982 is clearly erroneous. Although the agreement between Loyola and Liljeberg was not contingent on the outcome of the lawsuit, as a practical matter Loyola still had a substantial interest in Liljeberg's obtaining the certificate of approval. Without the certificate, it is very likely that Liljeberg would not have been able to build the hospital on the Monroe Tract. The construction of a hospital on its property was extremely important to Loyola as shown by the fact that Loyola was allowed under its agreement with Liljeberg to repurchase the land if a hospital was not built. Furthermore, the construction of a hospital on the Monroe Tract was critical to the effort to rezone the surrounding property owned by Loyola; the rezoning was also of vital interest to Loyola. Therefore, Loyola's interest in the litigation did not terminate as of March 19, 1982 and Judge Collins should have recused himself when he obtained actual knowledge of that interest on March 24." 796 F. 2d 796, 800–801 (1986).

The details of the transaction were discussed in three letters to the trustees dated March 12, 15, and 19, 1982, but Judge Collins did not examine any of those letters until shortly before the Board meeting on March 25, 1982. Thus, he acquired actual knowledge of Loyola's interest in the litigation on March 24, 1982. As the Court of Appeals correctly held, "Judge Collins should have recused himself when he obtained actual knowledge of that interest on March 24." 796 F. 2d, at 801.

In considering whether the Court of Appeals properly vacated the declaratory relief judgment, we are required to address two questions. We must first determine whether § 455(a) can be violated based on an appearance of partiality, even though the judge was not conscious of the circumstances creating the appearance of impropriety, and second, whether relief is available under Rule 60(b) when such a violation is not discovered until after the judgment has become final.

## III

Title 28 U. S. C. § 455 provides in relevant part:[7]

> "(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

---

[7] Prior to the 1974 amendments, § 455 simply provided:

"Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein." 28 U. S. C. § 455 (1970 ed.).

The statute was amended in 1974 to clarify and broaden the grounds for judicial disqualification and to conform with the recently adopted ABA Code of Judicial Conduct, Canon 3C (1974). See S. Rep. No. 93–419, p. 1 (1973); H. R. Rep. No. 93–1453, pp. 1–2 (1974). The general language of subsection (a) was designed to promote public confidence in the integrity of the judicial process by replacing the subjective "in his opinion" standard with an objective test. See S. Rep. No. 93–419, at 5; H. R. Rep. No. 93–1453, at 5.

"(b) He shall also disqualify himself in the following circumstances:

.        .        .        .        .

"(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding.

.        .        .        .        .

"(c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household."

Scienter is not an element of a violation of § 455(a). The judge's lack of knowledge of a disqualifying circumstance may bear on the question of remedy, but it does not eliminate the risk that "his impartiality might reasonably be questioned" by other persons. To read § 455(a) to provide that the judge must know of the disqualifying facts, requires not simply ignoring the language of the provision—which makes no mention of knowledge—but further requires concluding that the language in subsection (b)(4)—which expressly provides that the judge must *know* of his or her interest—is extraneous. A careful reading of the respective subsections makes clear that Congress intended to require knowledge under subsection (b)(4) and not to require knowledge under subsection (a).[8] Moreover, advancement of the purpose of the

---

[8] Petitioner contends that § 455(a) must be construed in light of § 455 (b)(4). He argues that the reference to knowledge in § 455(b)(4) indicates that Congress must have intended that scienter be an element under § 455 (a) as well. Petitioner reasons that § 455(a) is a catchall provision, encompassing all of the specifically enumerated grounds for disqualification under § 455(b), as well as other grounds not specified. Not requiring knowledge under § 455(a), in petitioner's view, would thus render meaningless the

provision—to promote public confidence in the integrity of the judicial process, see S. Rep. No. 93–419, p. 5 (1973); H. R. Rep. No. 93–1453, p. 5 (1974)—does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew. As Chief Judge Clark of the Court of Appeals explained:

> "The goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible. The judge's forgetfulness, however, is not the sort of objectively ascertainable fact that can avoid the appearance of partiality. *Hall* v. *Small Business Administration*, 695 F. 2d 175, 179 (5th Cir. 1983). Under section 455(a), therefore, recusal is required even when a judge lacks actual knowledge of the facts indicating his interest or

knowledge requirement under § 455(b)(4). The requirement could always be circumvented by simply moving for disqualification under § 455(a), rather than § 455(b).

Petitioner's argument ignores important differences between subsections (a) and (b)(4). Most importantly, § 455(b)(4) requires disqualification no matter how insubstantial the financial interest and regardless of whether or not the interest actually creates an appearance of impropriety. See § 455(d)(4); *In re Cement and Concrete Litigation*, 515 F. Supp. 1076 (Ariz. 1981), mandamus denied, 688 F. 2d 1297 (CA9 1982), aff'd by absence of quorum, *Arizona* v. *United States District Court*, 459 U. S. 1191 (1983). In addition, § 455(e) specifies that a judge may not accept a waiver of any ground for disqualification under § 455(b), but may accept such a waiver under § 455(a) after "a full disclosure on the record of the basis for disqualification." Section 455(b) is therefore a somewhat stricter provision, and thus is not simply redundant with the broader coverage of § 455(a) as petitioner's argument posits.

bias in the case if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge." 796 F. 2d, at 802.

Contrary to petitioner's contentions, this reading of the statute does not call upon judges to perform the impossible — to disqualify themselves based on facts they do not know. If, as petitioner argues, § 455(a) should only be applied prospectively, then requiring disqualification based on facts the judge does not know would of course be absurd; a judge could never be expected to disqualify himself based on some fact he does not know, even though the fact is one that perhaps he should know or one that people might reasonably suspect that he does know. But to the extent the provision can also, in proper cases, be applied retroactively, the judge is not called upon to perform an impossible feat. Rather, he is called upon to rectify an oversight and to take the steps necessary to maintain public confidence in the impartiality of the judiciary. If he concludes that "his impartiality might reasonably be questioned," then he should also find that the statute has been violated. This is certainly not an impossible task. No one questions that Judge Collins could have disqualified himself and vacated his judgment when he finally realized that Loyola had an interest in the litigation. The initial appeal was taken from his failure to disqualify himself and vacate the judgment *after* he became aware of the appearance of impropriety, not from his failure to disqualify himself when he first became involved in the litigation and lacked the requisite knowledge.

In this case both the District Court and the Court of Appeals found an ample basis in the record for concluding that an objective observer would have questioned Judge Collins' impartiality. Accordingly, even though his failure to disqualify himself was the product of a temporary lapse of memory, it was nevertheless a plain violation of the terms of the statute.

A conclusion that a statutory violation occurred does not, however, end our inquiry. As in other areas of the law, there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance.[9] There need not be a draconian remedy for every violation of § 455(a). It would be equally wrong, however, to adopt an absolute prohibition against any relief in cases involving forgetful judges.

## IV

Although § 455 defines the circumstances that mandate disqualification of federal judges, it neither prescribes nor prohibits any particular remedy for a violation of that duty. Congress has wisely delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation. In considering whether a remedy is appropriate, we do well to bear in mind that in many cases—and this is such an example—the Court of Appeals is in a better position to evaluate the significance of a violation than is this Court. Its judgment as to the proper remedy should thus be afforded our due consideration. A review of the facts demonstrates that the Court of Appeals' determination that a new trial is in order is well supported.

---

[9] Large, multidistrict class actions, for example, often present judges with unique difficulties in monitoring any potential interest they may have in the litigation. In such cases, the judge is required to familiarize himself or herself with the named parties and all the members of the class, which in an extreme case may number in the hundreds or even thousands. This already difficult task is compounded by the fact that the precise contours of the class are often not defined until well into the litigation. See *Union Carbide Corp.* v. *U. S. Cutting Service, Inc.*, 782 F. 2d 710, 714 (CA7 1986); *In re Cement and Concrete Antitrust Litigation*, 515 F. Supp., at 1080.

Of course, notwithstanding the size and complexity of the litigation, judges remain under a duty to stay informed of any personal or fiduciary financial interest they may have in cases over which they preside. See 28 U. S. C. § 455(c). The complexity of determining the conflict, however, may have a bearing on the Rule 60(b)(6) extraordinary circumstance analysis.

Section 455 does not, on its own, authorize the reopening of closed litigation. However, as respondent and the Court of Appeals recognized, Federal Rule of Civil Procedure 60(b) provides a procedure whereby, in appropriate cases, a party may be relieved of a final judgment.[10] In particular, Rule 60(b)(6), upon which respondent relies, grants federal courts broad authority to relieve a party from a final judgment "upon such terms as are just," provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5).[11] The Rule does not particularize the factors that

[10] Federal Rule of Civil Procedure 60(b) provides in relevant part:

"On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . . , misrepresentation, or other misconduct of an adverse party; . . . or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken."

[11] In *Klapprott* v. *United States*, 335 U. S. 601, 613 (1949), we held that a party may "not avail himself of the broad 'any other reason' clause of 60(b)" if his motion is based on grounds specified in clause (1)—"mistake, inadvertence, surprise, or excusable neglect." Rather, "extraordinary circumstances" are required to bring the motion within the "other reason" language and to prevent clause (6) from being used to circumvent the 1-year limitations period that applies to clause (1). This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive. See 11 C. Wright & A. Miller, Federal Practice and Procedure § 2864 (1973). We conclude that the basis for relief in this case is extraordinary and that the motion was thus proper under clause (6). See *infra*, at 865–867. Of particular importance, this is not a case involving neglect or lack of due diligence by respondent. Any such neglect is rather chargeable to Judge Collins. Had he informed the parties of his association with Loyola and of Loyola's interest in the litigation on March 24, 1982, when his knowledge of the University's interest was renewed, respondent could have raised the issue in a motion for a new trial or on appeal without requiring that the case be reopened. Moreover, even if

justify relief, but we have previously noted that it provides courts with authority "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice," *Klapprott* v. *United States*, 335 U. S. 601, 614–615 (1949), while also cautioning that it should only be applied in "extraordinary circumstances," *Ackermann* v. *United States*, 340 U. S. 193 (1950). Rule 60(b)(6) relief is accordingly neither categorically available nor categorically unavailable for all § 455(a) violations. We conclude that in determining whether a judgment should be vacated for a violation of § 455 (a), it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process. We must continuously bear in mind that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *In re Murchison*, 349 U. S. 133, 136 (1955) (citation omitted).

Like the Court of Appeals, we accept the District Court's finding that while the case was actually being tried Judge Collins did not have actual knowledge of Loyola's interest in the dispute over the ownership of St. Jude and its precious certificate of need. When a busy federal judge concentrates his or her full attention on a pending case, personal concerns are easily forgotten. The problem, however, is that people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of

---

respondent had taken the unusual step of reviewing the judge's financial disclosure forms—which reveal that he was a member of the Board of Trustees—the conflict would not have been brought to its attention. The conflict arose not simply from the judge's service on the Board of Trustees, but from his service on the Board while the University was involved in its dealings with Liljeberg. This latter fact would not have been made apparent through examination of the disclosure reports and, according to respondent, was not a matter of public record at the time the case was tried and decided.

judges.[12]    The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.    See S. Rep. No 93–419, at 5; H. R. Rep. No. 93–1453, at 5.    Thus, it is critically important in a case of this kind to identify the facts that might reasonably cause an objective observer to question Judge Collins' impartiality.    There are at least four such facts.

First, it is remarkable that the judge, who had regularly attended the meetings of the Board of Trustees since 1977, completely forgot about the University's interest in having a hospital constructed on its property in Kenner.    The importance of the project to the University is indicated by the fact that the 80-acre parcel, which represented only about 40% of the entire tract owned by the University, was sold for $6,694,000 and that the rezoning would substantially increase the value of the remaining 60%.    The "negotiations with the developers of the St. Jude Hospital" were the subject of discussion and formal action by the trustees at a meeting attended by Judge Collins only a few days before the lawsuit was filed.    App. 35.

---

[12] As we held in *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813 (1986), this concern has constitutional dimensions.    In that case we wrote:

"We conclude that Justice Embry's participation in this case violated appellant's due process rights as explicated in *Tumey, Murchison,* and *Ward.* We make clear that we are not required to decide whether in fact Justice Embry was influenced, but only whether sitting on the case then before the Supreme Court of Alabama ' "would offer a possible temptation to the average [judge] . . . [to] lead him not to hold the balance nice, clear and true." ' The Due Process Clause 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.    But to perform its high function in the best way, "justice must satisfy the appearance of justice." ' " *Id.,* at 825 (citations omitted).

A finding by another judge—faced with the difficult task of passing upon the integrity of a fellow member of the bench—that his or her colleague merely possessed *constructive* knowledge, and not *actual* knowledge, is unlikely to significantly quell the concerns of the skeptic.

Second, it is an unfortunate coincidence that although the judge regularly attended the meetings of the Board of Trustees, he was not present at the January 28, 1982, meeting, a week after the 2-day trial and while the case was still under advisement. The minutes of that meeting record that representatives of the University monitored the progress of the trial, but did not see fit to call to the judge's attention the obvious conflict of interest that resulted from having a University trustee preside over that trial. These minutes were mailed to Judge Collins on March 12, 1982. If the judge had opened that envelope when he received it on March 14 or 15, he would have been under a duty to recuse himself *before* he entered judgment on March 16.[13]

Third, it is remarkable—and quite inexcusable—that Judge Collins failed to recuse himself on March 24, 1982. A full disclosure at that time would have completely removed any basis for questioning the judge's impartiality and would have made it possible for a different judge to decide whether the interests—and appearance—of justice would have been served by a retrial. Another 2-day evidentiary hearing would surely have been less burdensome and less embarrassing than the protracted proceedings that resulted from Judge Collins' nonrecusal and nondisclosure. Moreover, as the

---

[13] One of the provisions of the contract between Loyola and Liljeberg is also remarkable. Despite the fact that earlier minutes of the Board make it clear that the University's interest in serious negotiations with Liljeberg was conditioned upon the certificate of need, the contract expressly recites that control of the certificate was the subject of pending litigation and then provides that "this sale shall not be in any way conditioned upon" the outcome of that litigation. App. 55. The University, however, retained the right to repurchase the property if Liljeberg was unable to go forward with the hospital project. If Liljeberg was found not to control the certificate of need, he, at least arguably, would have been precluded from going forward with the hospital. Moreover, if the parties simply wanted to make the transaction unconditional, they could have omitted any reference to the litigation. An objective observer might reasonably question why the parties felt a need to include this clause.

Court of Appeals correctly noted, Judge Collins' failure to disqualify himself on March 24, 1982, also constituted a violation of § 455(b)(4), which disqualifies a judge if he "knows that he, individually or as a fiduciary, . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." This separate violation of § 455 further compels the conclusion that vacatur was an appropriate remedy; by his silence, Judge Collins deprived respondent of a basis for making a timely motion for a new trial and also deprived it of an issue on direct appeal.[14]

Fourth, when respondent filed its motion to vacate, Judge Collins gave three reasons for denying the motion,[15] but still did not acknowledge that he had known about the University's interest both shortly before and shortly after the trial. Nor did he indicate any awareness of a duty to recuse himself in March 1982.

These facts create precisely the kind of appearance of impropriety that § 455(a) was intended to prevent. The violation is neither insubstantial nor excusable. Although Judge Collins did not know of his fiduciary interest in the litigation,

---

[14] We note that the Court of Appeals affirmed by a divided panel. The majority opinion relied extensively on the deference due a trial court as to its findings of fact. Although it is now too late to determine what effect this additional argument might have had on the decision, it is certainly within the realm of the possible that the court's decision would have been swayed.

[15] These were his three reasons:

"First, Loyola University was not and is not a party to this litigation, nor was any of its real estate the subject matter of this controversy. Second, Loyola University is a non-profit, educational institution, and any benefits [inuring] to that institution would not benefit any individual personally. Finally, and most significantly, this Judge never served on either the Real Estate or Executive Committees of the Loyola University Board of Trustees. Thus, this Judge had no participation of any kind in negotiating Loyola University's real estate transactions and, in fact, had no knowledge of such transactions." App. to Pet. for Cert. 50a.

he certainly should have known. In fact, his failure to stay informed of this fiduciary interest may well constitute a separate violation of § 455. See § 455(c). Moreover, providing relief in cases such as this will not produce injustice in other cases; to the contrary, the Court of Appeals' willingness to enforce § 455 may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered. It is therefore appropriate to vacate the judgment unless it can be said that respondent did not make a timely request for relief, or that it would otherwise be unfair to deprive the prevailing party of its judgment.

If we focus on fairness to the particular litigants, a careful study of Judge Rubin's analysis of the merits of the underlying litigation suggests that there is a greater risk of unfairness in upholding the judgment in favor of Liljeberg than there is in allowing a new judge to take a fresh look at the issues.[16] Moreover, neither Liljeberg nor Loyola Univer-

---

[16] In an unpublished opinion a majority of the Court of Appeals concluded that Judge Collins' findings of fact were not clearly erroneous. In dissent, Judge Rubin expressed the opinion that "Liljeberg's chicanery," id., at 78a, gave rise to an estoppel as a matter of law. He wrote:

"Whether Liljeberg consciously intended to mislead HAI we need not decide. His decision to sign and return the agreement knowing that HAI believed it to be sufficient to transfer 'ownership' makes it clear that he was willing to mislead HAI. . . .

"HAI was misled by Liljeberg's silence into doing what it would not otherwise have done: filing the application for a certificate of need. The HAI witnesses all testified that the company never filed an application unless it wholly controlled the filing corporation; Liljeberg testified that he was aware of that policy.[8]" Id., at 76a–77a.

At this point, Judge Rubin inserted the following footnote:

"[8] That HAI was misled is clear from the face of the application. HAI there described St. Jude as a 'wholly-owned subsidiary.' Indeed, the entire 407-page application is devoted to describing HAI, its hospitals, its management experience, and its assets. Liljeberg's name appears only in three letters of intent to file an application for a certificate of need dated

sity has made a showing of special hardship by reason of their reliance on the original judgment.[17] Finally, although a delay of 10 months after the affirmance by the Court of Appeals would normally foreclose relief based on a violation of § 455(a), in this case the entire delay is attributable to Judge Collins' inexcusable failure to disqualify himself on March 24, 1982; had he recused himself on March 24, or even disclosed Loyola's interest in the case at that time, the motion could have been made less than 10 days after the entry of judgment. "The guiding consideration is that the administration

---

before July, 1980, and on a copy of the Warranty and Indemnity Agreement. HAI also changed the name of St. Jude's registered agent, further demonstrating its belief that it controlled St. Jude." *Id.*, at 77a, n. 8. Judge Rubin then continued:

"Therefore, Liljeberg's silence at the time he signed the warranty agreement should estop him from claiming that the agreement, read in conjunction with the HAI cover letter and Douglas' letter enclosing corporate documents, did not transfer control of St. Jude to HAI. However, because Liljeberg's deception did not end there, the estoppel need not rest on that alone.

"Liljeberg signed the March 16, 1981 commission agreement which stated that he was to receive $250,000 (plus interest) only if *HAI* received final section 1122 approval. After the certificate of need was issued, Liljeberg requested and received the commission, which, when paid, amounted to $271,000. In relieving Hospital Corporation of America (HCA), HAI's successor, of $271,000, Liljeberg never mentioned his contention that he still 'owned' St. Jude, and that St. Jude, not HAI, had received the certificate. . . .

"HAI relied on Liljeberg's agreement that it owned St. Jude in buying the property on which the hospital was to be built. HCA justifiably relied on Liljeberg's agreement that it owned St. Jude in paying the commission." *Id.*, at 77a–78a.

[17] In fact, Liljeberg's ownership of the certificate of need has never been entirely settled. On January 31, 1983, just two weeks after the Fifth Circuit's judgment affirming Judge Collins on the merits became final, respondent filed suit against St. Jude and various federal and state agencies. The new action alleges that the certificate was improperly issued in the name of St. Jude and that respondent is instead entitled to the certificate. See *Health Services Acquisition Corp.* v. *Gussinger,* Civil Action No. 83–3031 (ED La.). This litigation is still pending.

of justice should reasonably appear to be disinterested as well as be so in fact." *Public Utilities Comm'n of D. C.* v. *Pollak,* 343 U. S. 451, 466–467 (1952) (Frankfurter, J., in chambers). In sum, we conclude that Chief Judge Clark's opinion of the Court of Appeals reflects an eminently sound and wise disposition of this case.

The judgment of the Court of Appeals is accordingly

*Affirmed.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE WHITE and JUSTICE SCALIA join, dissenting.

The Court's decision in this case is long on ethics in the abstract, but short on workable rules of law. The Court first finds that 28 U. S. C. § 455(a) can be used to disqualify a judge on the basis of facts not known to the judge himself. It then broadens the standard for overturning final judgments under Federal Rule of Civil Procedure 60(b). Because these results are at odds with the intended scope of § 455 and Rule 60(b), and are likely to cause considerable mischief when courts attempt to apply them, I dissent.

I

As detailed in the Court's opinion, § 455(a) provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Section 455 was substantially revised by Congress in 1974 to conform with the recently adopted Canon 3C of the American Bar Association's Code of Judicial Conduct (1974). Previously, a federal judge was required to recuse himself when he had a substantial interest in the proceedings, or when "in his opinion" it was improper for him to hear the case.[1] Subsection (a) was drafted

---

[1] The predecessor statute, which had been part of the United States Code for 60 years, stated:

"§ 455. Interest of justice or judge.

"Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has

to replace the subjective standard of the old disqualification statute with an objective test. Congress hoped that this objective standard would promote public confidence in the impartiality of the judicial process by instructing a judge, when confronted with circumstances in which his impartiality could reasonably be doubted, to disqualify himself and allow another judge to preside over the case.[2] The amended statute also had the effect of removing the so-called "duty to sit," which had become an accepted gloss on the existing statute.[3]

Subsection (b) of § 455 sets forth more particularized situations in which a judge must disqualify himself. Congress intended the provisions of § 455(b) to remove any doubt about recusal in cases where a judge's interest is too closely connected with the litigation to allow his participation. Subsection (b)(4), for example, disqualifies a jurist if he knows that he, his spouse, or his minor children have a financial interest in the subject matter in controversy. Unlike the more openended provision adopted in subsection (a), the language of subsection (b) requires recusal only in specific circumstances, and is phrased in such a way as to suggest a requirement of actual knowledge of the disqualifying circumstances.

The purpose of § 455 is obviously to inform judges of what matters they must consider in deciding whether to recuse themselves in a given case. The Court here holds, as did the

---

been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein." 28 U. S. C. § 455 (1970 ed.).

[2] See H. R. Rep. No. 93–1453, p. 5 (1974). See also Bloom, Judicial Bias and Financial Interest as Grounds for Disqualification of Federal Judges, 35 Case W. Res. L. Rev. 662, 670–676 (1985); Comment, Disqualification of Federal Judges for Bias or Prejudice, 46 U. Chi. L. Rev. 236, 238–242 (1978).

[3] While § 455 provides guidance to a judge when he is considering recusing himself, 28 U. S. C. § 144 supplies a litigant with the opportunity to file an affidavit that the judge before whom the matter is pending has a personal bias or prejudice sufficient to mandate disqualification. Respondent filed no affidavit or motion under § 144 in this case.

Court of Appeals below, that a judge must recuse himself under § 455(a) if he *should have known* of the circumstances requiring disqualification, even though in fact he did not know of them. I do not believe this is a tenable construction of subsection (a). A judge considering whether or not to recuse himself is necessarily limited to those facts bearing on the question of which he has knowledge. To hold that disqualification is required by reason of facts which the judge does *not* know, even though he should have known of them, is to posit a conundrum which is not decipherable by ordinary mortals. While the concept of "constructive knowledge" is useful in other areas of the law, I do not think it should be imported into § 455(a).

At the direction of the Court of Appeals, Judge Schwartz of the District Court for the Eastern District of Louisiana made factual findings concerning the extent and timing of Judge Collins' knowledge of Loyola's interest in the underlying lawsuit. See *ante*, at 851. Judge Schwartz determined that Judge Collins had no actual knowledge of Loyola's involvement when he tried the case. Not until March 24, 1982, when he reviewed materials in preparation for a Board meeting, did Judge Collins obtain actual knowledge of the negotiations between petitioners and Loyola.

Despite this factual determination, reached after a public hearing on the subject, the Court nevertheless concludes that "public confidence in the impartiality of the judiciary" compels retroactive disqualification of Judge Collins under § 455(a). This conclusion interprets § 455(a) in a manner which Congress never intended. As the Court of Appeals noted, in drafting § 455(a) Congress was concerned with the "appearance" of impropriety, and to that end changed the previous subjective standard for disqualification to an objective one; no longer was disqualification to be decided on the basis of the opinion of the judge in question, but by the standard of what a reasonable person would think. But the facts and circumstances which this reasonable person would consider must be

the facts and circumstances *known* to the judge at the time. In short, as is unquestionably the case with subsection (b), I would adhere to a standard of actual knowledge in § 455(a), and not slide off into the very speculative ground of "constructive" knowledge.

## II

The Court then compounds its error by allowing Federal Rule of Civil Procedure 60(b)(6) to be used to set aside a final judgment in this case. Rule 60(b) authorizes a district court, on motion and upon such terms as are just, to relieve a party from a final judgment, order, or proceeding for any "reason justifying relief from the operation of the judgment." However, we have repeatedly instructed that only truly "extraordinary circumstances" will permit a party successfully to invoke the "any other reason" clause of § 60(b). See *Klapprott* v. *United States*, 335 U. S. 601, 613 (1949); see also *Ackermann* v. *United States*, 340 U. S. 193, 199 (1950). This very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved.

For even if one accepts the Court's proposition that § 455(a) permits disqualification on the basis of a judge's constructive knowledge, Rule 60(b)(6) should not be used in this case to apply § 455(a) retroactively to Judge Collins' participation in the lawsuit. In the first place, it is beyond cavil that Judge Collins stood to receive no *personal* financial gain from the transactions involving petitioner, respondent, and Loyola. Judge Collins' only prior tie to the dealings was as a member of Loyola's rather large Board of Trustees and, although Judge Collins was a member of at least two of the Board's subcommittees, he had no connection with the Real Estate subcommittee, the entity responsible for negotiating the sale of the Monroe Tract. In addition, the motion to set aside the judgment was made by respondent almost 10 months after judgment was entered in March 1982; although relief under Rule 60(b)(6) is subject to no absolute time limitation, there can be no serious argument that the time elapsed since the

entry of judgment must weigh heavily in considering the motion. Finally, and most important, Judge Schwartz determined that Judge Collins did not have actual knowledge of his conflict of interest during trial and that he made no rulings after he acquired actual knowledge.[4] I thus think it very unlikely that respondent was subjected to substantial injustice by Judge Collins' failure to recuse himself, and believe that the majority's use of Rule 60(b)(6) retroactively to set aside the underlying judgment is therefore unwarranted.

JUSTICE O'CONNOR, dissenting.

For the reasons given by CHIEF JUSTICE REHNQUIST, *ante*, at 871–873, I agree that "constructive knowledge" cannot be the basis for a violation of 28 U. S. C. § 455(a). The question then remains whether respondent is entitled to a new trial because there are other "extraordinary circumstances," apart from the § 455(a) violation found by the Fifth Circuit, that justify "relief from the operation of the judgment." See Fed. Rule Civ. Proc. 60(b)(6); *Ackermann* v. *United States*, 340 U. S. 193, 199 (1950); *Klapprott* v. *United States*, 335 U. S. 601, 613 (1949). Although the Court collects an impressive array of arguments that might support the granting of such relief, I believe the issue should be addressed in the first instance by the courts below. I would therefore remand this case with appropriate instructions.

---

[4] The majority's opinion suggests a number of troubling hypothetical situations, only one of which will demonstrate the difficulties inherent in its decision. Suppose Judge Doe sits on a bench trial involving X Corp. and Y Corp. The judge rules for X Corp., and judgment is affirmed on appeal. Ten years later, officials at Y Corp. learn that, unbeknownst to him, Judge Doe owned several shares of stock in X Corp. Even in the face of an independent factual finding that Judge Doe had no knowledge of this ownership, the Court's construction of § 455(a) and Rule 60(b) would permit the final judgment in X Corp.'s favor to be set aside if the "appearance of impartiality" were not deemed wholly satisfied. Such a result will adversely affect the reliance placed on final judgments and will inhibit developments premised on their finality.