**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 01-20341
_____


C.P. INTERESTS INC. doing business as CALIFORNIA POOLS,

Plaintiff - Counter Defendant - Appellee,

CALIFORNIA POOL SERVICE; CALIFORNIA POOL REPAIR & SERVICE CO.,

Plaintiffs - Appellees


VERSUS

CALIFORNIA POOLS INC; ET AL

Defendants,

CALIFORNIA POOLS INC; CALIFORNIA POOLS & SPAS, CALIFORNIA POOLS & SPAS INC; W. DOUGLAS STEIMLE

Defendants - Counter Claimants - Appellants.



_____

Appeal from the United States District Court
For the Southern District of Texas
_____

(H-98-CV-29)

March 20, 2002


Before GARWOOD, DeMOSS, and DENNIS, Circuit Judges.

PER CURIAM:[*]

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

California Pools, Inc. appeals the district court's ruling denying its 60(b) motion for relief from the district court's earlier judgment that granted relief to C.P. Interests for trademark infringement and business disparagement. For the reasons assigned below, we AFFIRM the district court's denial of 60(b) relief to California Pools.

I.    FACTS AND PROCEDURAL HISTORY

California Pools, Inc. is a California corporation dedicated to the construction of swimming pools and spas in several western states.    California Pools has constructed new pools since its inception in 1952, and filed a federal trademark registration for the mark "California Pools & Spas, Inc." in 1995.   In 1997, following a failed attempt to establish a branch in Dallas in the 1980s, California Pools sought to open a Houston branch office.

In Houston, California Pools encountered a Texas corporation incorporated as "C.P. Interests, Inc." but doing business as "California Pool Repair & Service Company."  C.P. Interests, Inc. is a Texas corporation that traces its roots to the "California Pool Service" company of Dallas, a company dedicated primarily to pool service and repair.[1]  From 1993 to 1997, C.P. Interests was also in the pool building business in Houston, Texas.   In 1997,

---

[1] The above facts have been taken verbatim from C.P. Interests v. California Pools, Inc., 238 F.3d 690, 692-93 (5th Cir. 2001).

after negotiations between Mr. Lonnie Chance and C.P. Interests's vice president, Dennis Alexander, Water Recreation Incorporated (WRI) was formed for the purposes of building pools. Pursuant to an oral licensing agreement with C.P. Interests, WRI built pools under the name "California Pools" in exchange for remitting 50% of the profits to C.P. Interests on each pool built. C.P. Interests and WRI worked out of the same office.

Following California Pools's attempted move into the Houston market, C.P. Interests filed suit claiming rights to the name "California Pools" based on predecessor use and alleging business disparagement by California Pools. After a jury trial in which Mr. Alexander testified as vice president of C.P. Interests, the jury decided that California Pools had committed common-law trademark infringement and business disparagement against C.P. Interests. The court awarded C.P. Interests the exclusive right to use the name "California Pools" within a 100 mile radius of Houston and, in accordance with the jury verdict, assessed punitive and general damages against California Pools. California Pools appealed to this court. This court reversed the district court with regard to business disparagement and affirmed the district court's decision in all other aspects.[2]

On September 15, 2000, California Pools filed a 60(b) motion with the district court to vacate its earlier judgment based on

_____

[2] C.P. Interests, 238 F.3d at 692-93.

fraud, misrepresentation, and misconduct.  California Pools alleged

that Mr. Alexander made material misrepresentations and testified

falsely during the trial and discovery in this case.  California

Pools claims to have discovered this fraud because of conflicting

testimony given by Mr. Alexander during a deposition in a separate

breach of contract case involving different litigants.[3]  The

district court denied the motion without a hearing and without

rendering an opinion.  California Pools now appeals the district

court's denial of its 60(b) motion to this court.[4]


## II.  ANALYSIS

Federal Rule of Civil Procedure 60(b)(3) provides that "[o]n

motion or upon such terms that are just, the court may relieve a

party from a final judgment, order, or proceeding for the following

reasons: . . . fraud whether heretofore denominated intrinsic or

---

[3]  WRI was sued by Sven and Grethe Havig (among others) for breach of contract for failing to complete construction on the plaintiffs' pool.  The plaintiffs sought to join C.P. Interests as defendants under the theory that WRI was C.P. Interests's alter ego.  On August 30, 2000, Mr. Alexander was deposed by the plaintiffs' attorney.

[4] California Pools also contends that the district court erred in failing to provide a hearing.  A court's decision not to hold a hearing on a 60(b) motion is reviewed for an abuse of discretion. Wilson v. Johns-Manville Sales Corp., 873 F.2d 869, 872-73 (5th Cir. 1989) (Whether or not the district court should have had a hearing of California Pools's 60(b) motion is "within the sound discretion of the district court" and is reviewed only for "abuse of discretion.").  Because we find no abuse of discretion in the district court's ultimate decision, we do not find error in its decision not to provide a hearing.

4

extrinsic), misrepresentation, or other misconduct of an adverse party." Fed. R. Civ. P. 60(b)(3). Under Rule 60(b)(3), "[o]ne who asserts that an adverse party has obtained a verdict through fraud, misrepresentation, or other misconduct has the burden of proving the assertion by clear and convincing evidence. . . ." <u>Rozier v. Ford Motor Co.</u>, 573 F.2d 1332, 1339 (5th Cir. 1978) (citation omitted). "Rule 60(b)(3) . . . does not require that the information withheld be of such nature as to alter the result in the case." <u>Id.</u> "The purpose of the rule is to afford parties relief from judgments which are unfairly obtained, not those which may be factually incorrect." <u>Diaz v. Methodist Hosp.</u>, 46 F.3d 492, 496 (5th Cir. 1995). "The conduct complained of must be such as prevented the losing party from fully and fairly presenting his case or defense." <u>Rozier</u>, 573 F.2d at 1339; <u>Johnson v. Offshore Express, Inc.</u>, 845 F.2d 1347, 1358 (5th Cir. 1988).[5]

---

[5] Without separate argument, the parties also appear to challenge the district court's decision under Rule 60(b)(6) which allows relief from a judgment for "any other reason justifying relief from the operation of the judgment." "Rule 60(b)(6) . . . grants federal courts broad authority to relieve a party from a final judgment . . . provided that the motion . . . is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." <u>Liljeberg v. Health Servs. Corp.</u>, 486 U.S. 847, 863 n.11 (1988). Because the appellant's challenge more properly comes under the Rule 60(b)(3), relief under Rule 60(b)(6) is unavailable. <u>Wilson</u>, 873 F.2d at 872. Moreover, rule 60(b)(6) is a "extraordinary remedy" available only in "extraordinary circumstances." <u>Fackelman v. Bell</u>, 564 F.2d 734, 737 (5th Cir. 1977). "In this case we do not find the extraordinary circumstances that might require a reversal of the trial court under 60(b)(6), and we cannot say that it was an abuse of discretion to deny the motion on the basis of that section." <u>Id.</u>

A motion under 60(b) is "addressed to the sound discretion of the trial court whose decision will not be reversed absent a clear abuse of discretion." Johnson, 845 F.2d at 1357; Rozier, 573 F.2d at 1337; Fackelman v. Bell, 564 F.2d 734, 736 (5th Cir. 1977). "It is not enough that the granting of relief might have been permissible, or even warranted--denial must have been so *unwarranted* as to constitute an abuse of discretion." Stipelcovich v. Sand Dollar Marine, Inc., 805 F.2d 599, 604 (5th Cir. 1986) (quoting Seven Elves, Inc. v. Eskanazi, 635 F.2d 396, 402 (5th Cir. 1981) (emphasis in original)); Fackelman, 564 F.2d at 736.

The crux of California Pools's argument is that Mr. Alexander gave testimony in his deposition in this case emphasizing the closeness of C.P. Interests's relationship with WRI and gave the false impression that C.P. Interests had control, supervision, and ownership of WRI, thus foreclosing a "naked licensing"[6] defense under which California Pools could have argued priority of its trademark.

To that end, California Pools argues that Mr. Alexander's

---

[6] A "naked license" is "[a] license allowing a licensee to use a trademark on any goods and services the licensee chooses." Black's Law Dictionary 931 (7th ed. 1999). "Uncontrolled licensing of a mark whereby the licensee can place the mark on any quality or type of goods or services may cause the mark to lose any significance it may have." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 18.48 (4th ed. 2000). "Courts have long imposed upon trademark licensors a duty to oversee the quality of licensees' products." Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 387 (5th Cir. 1977). "A trademark owner who allows this to occur loses its right to use the mark." Id.

testimony was false on four issues.  First, at trial in this case Mr. Alexander testified that WRI was half owned by C.P. Interests:

> Q:    And Water Recreation or Water Recrionics is – half
>       of it is C.P. Interests and half of it is this guy,
>       Lonnie Chance?
>
>       . . . .
>
> A:    That's correct.

In the breach of contract case, however, Mr. Alexander claimed that C.P. Interests did not own WRI, only Mr. Lonnie Chance did:

> Q:    All right.  And who owned Water Recreation, Inc.?
>
> A:    Lonnie Chance.
>
> Q:    Okay.  Anyone else?
>
> A:    No.

C.P. Interests contends, however, that these statements are taken out of context and explains that this seeming inconsistency reflects only a layman's understanding of corporate ownership.  Mr. Alexander's limited knowledge on this topic was pointed out in the trademark litigation by his counsel who "object[ed] to [the question to] the extent that [it] calls for a legal conclusion."  Only upon opposing counsel's insistence to proceed, did Mr. Alexander instruct his client to answer "[b]ased on whatever your understanding is."  Consequently, according to C.P. Interests, Mr. Alexander proceeded  to the best of his knowledge and stated that "C.P. Interests . . . own[s] 50 percent of [WRI] *because* C.P. Interest is the one that's paid by Water Recreation."  (emphasis

7

added).  C.P. Interests argues that Mr. Alexander's testimony consistently reflected that C.P. Interests received 50% of WRI's profits in exchange for allowing WRI to use the "California Pools" mark.  In the trademark litigation, Mr. Alexander testified that C.P. Interests had a "verbal agreement" with WRI in which "Lonnie Chance gets 50 percent of the proceeds off if it and . . .  C.P. Interests gets 50 percent of the proceeds off of it."  By the time of the breach of contract litigation, over a year later,  Mr. Alexander's understanding of corporate ownership and structure was more sophisticated and, consequently, he was better able to flesh out the relationship between WRI and C.P. Interests, i.e., C.P. Interests received "50 percent of the profits of each pool" in exchange for the right to "the right to use the name California Pools."

California Pools's second contention is that Mr. Alexander falsely testified regarding the date of WRI's formation.  In the trademark litigation, California Pools contends that Mr. Alexander stated that WRI began operating in June or July of 1997, but, in the breach of contract case, he claimed that WRI was formed in October.  This date is relevant, according to California Pools, because it entered the Houston swimming pool construction market in August of 1997.  In the trademark litigation, Mr. Alexander testified as follows:

Q:  I believe you testified that you hired or Mr.
    Chance started working with you, I think, in about

8

October 1997. Is that correct?

A: No, that's not correct.

Q: What is correct?

A: He and I started working together on a regular basis in June or July and we had started consummating our deal – or finished consummating our deal in May 1997.

Q: Well, you didn't form Water Recreation until October. Is that correct?

A: That's right. We set up the corporation in October.

In the breach of contract case, Mr. Alexander stated:

Q: And when did this call from Mr. Chance to you come?

A: I couldn't tell you the month exactly but I'm thinking it was probably around this time in 1997.

Q: Okay. So, late August, early September 1997; is that right?

A: That'd be my guesstimation.

Q: Okay. How many – and this would have begun – this relationship would have begun in what, the fall of 1997?

A: Yeah, in that time – time frame, I believe.

Q: How long a period was it between the time of that initial phone call up until the time he actually moved in and began efforts to sell swimming pools

9

using California Pools?

A:	I think it was in or around October maybe.

C.P. Interests argues that there is no conflict in Mr. Alexander's testimony.  In the trademark case, Mr. Alexander testified that he and Mr. Chance were working out a deal in May of 1997 but that WRI was not formed until October of 1997.  Similarly, in the breach of contract case, Mr. Alexander indicated that he "guesstimated" that his relationship with Chance began in the fall of 1997 and that he thought "it was in or around October maybe" that WRI began making efforts to sell the pools using the California Pools name.  Finally, C.P. Interests argues that not only is there no contradiction here, but the exact date of the formation of WRI is irrelevant because, even if California Pools entered the Houston market in August of 1997, C.P. Interests had been building pools using the "California Pools" name since 1993.  Thus, no legal significance for trademark purposes could attach to when WRI was formed.

Third, California Pools argues that in this case Mr. Alexander claimed to be personally involved on a daily basis in WRI's construction activities.

Q:	Do you have any dealings or do you have any say in
what Water Recreation – at least in the day-to-day
running of the business?

A:	Every day.

In the breach of contract case, however, California Pools claims

10

that Mr. Alexander testified that he did not control or supervise the work of WRI in any way.

Q:  Were you involved – and when I say you, C.P. Interests – was C.P. Interests involved in the day-to-day operations of Water Recreation?

A:  No.

Q:  Okay.  Was C.P. Interests involved in supervising any of Lonnie Chance's operations?

A:  No.

Q:  – in Water Recreation?

A:  No.

. . . .

Q:  Okay.  You weren't monitoring the type of deals or work that Lonnie Chance and Water Recreation, Inc. was doing?

A:  I was trying to sometimes because I would get unhappy phone calls.  And I – I'm a – I've been in the business 28 years.  Okay.  For whatever it's worth, I'm a pool expert.  And I'm pretty fair with customers because I've dealt with them a long time.  So I would try to find out what the problem was over the telephone if I received a nasty call and then go in there and raise hell with him or whoever I felt like it should be directed at and say, take care of these people –

Moreover, contends California Pools, in a letter dated November 8, 1999, to one of plaintiffs in the breach of contract case, Mr.

11

Alexander stated, "Please note that Dennis Alexander, Lewis Wiebe nor California Pools have no dealings with, nor are we involved in Water Recreation business, hence we are unable to offer a solution to the problems that you are experiencing in the construction of your swimming pool."

According to C.P. Interests, Mr. Alexander has consistently maintained that although C.P. Interests had day-to-day dealings with WRI and exercised appropriate oversight, it did not exert daily control over WRI's operations or domination over WRI so as to be considered its alter ego. This is obvious from the fact that although Mr. Alexander sometimes fielded customer complaints for WRI and although WRI and C.P. Interests are "run . . . out of the same office," Mr. Alexander does not, as he testified, "write the paychecks" for WRI. Moreover, C.P. Interests argues that the November 1999 letter to a client in the construction case does not impugn Mr. Alexander's August 1999 testimony, as the letter reflects the true state of the relationship between the parties as of that date. On September 20, 1999, C.P. Interests severed its business relationship with WRI by withdrawing its right "to use the name 'CALIFORNIA POOLS' under a 'limited license.'"

Finally, California Pools also argues that Mr. Alexander misled the jury with respect to the amount of damages C.P. Interests incurred as a result of California Pools's trademark infringement. Although California Pools concedes that C.P. Interests was entitled to a share of WRI's lost profits, California

12

Pools argues that the jury may have mistakenly thought that C.P. Interests was entitled to damages based on its own lost profitability, as Mr. Alexander testified in the trademark case that C.P. Interests built[7] and advertised[8] pools from 1997 to 1999. In the breach of contract case, however, California Pools asserts that Mr. Alexander claimed that C.P. Interests did not build or advertise pools while WRI was in operation.

Q:    Would there have been such advertising each year from 1989 through the present?

A:    No.  The years that Water Recreation used our name we did not advertise building any pools.

Q:    Okay.

A:    We did not construct any pools of our own.

Once again, C.P. Interests argues that there is no testimonial conflict involved here, as Mr. Alexander made clear in both cases that WRI was building the pools, and not C.P. Interests, and that these companies were two separate corporate entities.  His response to the questioning about the advertizing and construction of pools between 1997 and 1999 indicates the number of pools built and advertized under its "California Pools" name in Houston, not the

_____

[7] In response the court district court's question, "How many pools did you build in 1997?", Mr. Alexander testified that over 380 had been built.

[8] In response to a question referencing "California Pools" advertisements that appeared in local papers in 1997, Mr. Alexander replied, "Yes.  They all appear to be our advertizing in local papers."

number of pools built particularly by C.P. Interests. California Pools cannot claim to be misled, argues C.P. Interests, as Mr. Alexander unambiguously testified in his deposition that, although C.P. Interests built pools in 1993, "[a]t present, C.P. Interests does not handle the construction. [WRI] handles the construction." And, when asked which entity, WRI or C.P. Interests, pays for the advertising, Mr. Alexander responded, "The construction does. [WRI]".

"In reviewing the instant denial of plaintiff's Rule 60(b)(3) motion for abuse of discretion, it is not without significance that the trial judge stated no reasons for denial." Rozier, 573 F.2d at 1346. A district court's decision not to provide reasons for its denial of a 60(b) motion is not, however, a per se abuse of discretion. Provident Life & Accident Ins. Co. v. Goel, 274 F.3d 984, 999 (5th Cir. 2001). Instead, we must search the record to determine if there are sufficient reasons to sustain the district court's exercise of its discretion. Rozier, 573 F.2d at 1346.

"If unequivocal evidence establishes that a party willfully perjured himself, and thereby prevented the opposition from fully and fairly presenting its case, use of Rule 60(b)(3) to grant the innocent party a new trial would be a proper response. This, however, is not such a case." Diaz, 46 F.3d at 497. Regarding the date of formation of WRI, we find no inconsistency in Mr. Alexander's testimony, as he indicated in both cases that WRI began operating in October of 1997. Moreover, as C.P. Interests had been

14

involved in the pool construction business in Houston since 1993, the exact date of WRI's formation is irrelevant. Also, California Pools's challenge to the jury's damage award is unavailing as, in both cases, Mr. Alexander made clear to California Pools that construction and advertizing of pools was done by WRI during the pertinent time. California Pools's claim that the jury was misled into awarding damages based on the lost profits of both WRI and C.P. Interests is both without support and contradictory, as it also argues that Mr. Alexander testified as to C.P. Interests's lost profitability using financial statements of WRI -- a company of which, Mr. Alexander testified, "half . . . is C.P. Interests and half . . . is this guy, Lonnie Chance." Although some seeming inconsistencies in Mr. Alexander's testimony do exist regarding C.P. Interests's relationship with WRI, C.P Interests has presented plausible explanations for these inconsistencies, and, consequently, we do not find "unequivocal" or "clear and convincing" evidence of perjury. Both parties concede that Mr. Alexander testified more than any other witness at trial. The district judge observed the witness, heard his testimony, and is familiar with the facts of this case. We do not find the district judge's denial of 60(b) relief to be so unwarranted as to constitute an abuse of discretion.[9]

---

[9] Even if we were to accept California Pools's allegations of perjury, "[w]hen a party is capable of fully and fairly presenting her case notwithstanding 'fraud, misrepresentation, or other misconduct,' the trial court does not err when it denies a Rule

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court denying the defendant's 60(b) motion is **AFFIRMED**.

---

60(b)(3) motion." <u>Diaz</u>, 46 F.3d at 497. It is unclear whether knowledge of the corporate relationship between C.P. Interests and WRI was "under the exclusive control of the Appellees" and that "a more focused effort by Appellant could [not] have uncovered this evidence prior to trial." <u>Id.</u>