# STATE OF MICHIGAN

# COURT OF APPEALS

---

SRVAN BRICK & STONE, INC.,

    Plaintiff/Counter-Defendant-
    Appellee,

v

W B HUNT CORP., BAY BLOCK, LLC,

    Defendants/Counter-
    Plaintiffs/Third-Party Plaintiffs-
    Appellants,

and

WILLIAM B. HUNT,

    Defendant-Appellant,

and

MARK VAN POPPELEN and RENEE VAN
POPPELEN,

    Third-Party Defendants-Appellees.

UNPUBLISHED
January 22, 2015

No.   316585
Bay Circuit Court
LC No.   12-003009-CK

---

SRVAN BRICK & STONE, INC.,

    Plaintiff-Appellee,

v

W B HUNT CORP. and BAY BLOCK, LLC,

    Defendant/Third-Party Plaintiffs-
    Appellant,

and

WILLIAM B. HUNT,

    Defendant-Appellant,

No.   319213
Bay Circuit Court
LC No.   12-003009-CK

-1-

and

SUSAN ELLEN HUNT,

        Defendant,

and

MARK VAN POPPELEN,

        Third-Part Defendant-Appellee

Before: MURRAY, P.J., and SAAD and K. F. KELLY, JJ.

PER CURIAM.

In Docket No. 316585, defendants-counter plaintiffs, WB Hunt Corporation and Bay Block LLC, along with defendant-appellant William B. Hunt (collectively "defendants"), appeal by leave granted[1] from an April 18, 2013 order entered by Bay Circuit Court Judge Joseph K. Sheeran, which granted default judgment and other sanctions in favor of plaintiff-counter defendant-appellee, SRVAN Brick & Stone Inc., and third party defendants-appellees, Mark and Renee Van Poppelen.

In Docket No. 319213, defendants appeal by leave granted[2] from three November 14, 2013 orders entered by Bay Circuit Court Judge Harry Gill: (1) denying their motion to vacate the April 18, 2013 sanctions order and a June 11, 2013 partial judgment, (2) denying their motion for reexamination, and (3) granting plaintiff SRVAN Brick and Stone Inc.'s motion to compel discovery.

Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

SRVAN sells building materials. It is wholly owned by Renee Van Poppelen. SRVAN employs Renee's husband, Mark Van Poppelen. Mark Van Poppelen was the owner and manager of Van Poppelen Bros., Inc. (VPB), a manufacturer of concrete blocks. VPB employed Renee as its controller.

---

[1] *SRVAN Brick & Stone Inc v W B Hunt Corp,* unpublished order of the Court of Appeals, entered December 18, 2013 (Docket No. 316585).

[2] *SRVAN Brick & Stone Inc v W B Hunt Corp,* unpublished order of the Court of Appeals, entered December 4, 2013 (Docket No. 319213).

VPB had a history of financial troubles, including a bankruptcy filing in 2005. VPB emerged from bankruptcy with a $750,000.00 debt to Independent Bank, secured by VPB assets and a personal guaranty by Mark. In 2007, the operations of SRVAN and VPB became intertwined.

In September 2011, Renee and Mark discussed a possible sale of VPB assets to William Hunt's company, WB Hunt, for $225,000.00. They entered into a purchase agreement. At that time, Independent Bank had an action pending against VPB for failing to pay its debt of more than $600,000.00. Before the sale was finalized, VPB was placed into receivership. Bay Circuit Court Judge Joseph K. Sheeran presided over the case, and entered a consent order appointing a receiver on September 6, 2011 in the case of *Independent Bank v Van Poppelen*, circuit court case no. 11-003534-CH.

WB Hunt continued its efforts to purchase VPB out of receivership, and eventually became parties to the *Independent Bank* case. SRVAN claimed that it owned some of the assets that were used by VPB. On October 27, 2011, Mark and Renee entered into a conditional purchase agreement with WB Hunt. Mark and Renee would sell WB Hunt all of SRVAN's assets, except its inventory, for $1.00 and WB Hunt would assume SRVAN's liability of $34,000.00. The purchase was conditioned on a due diligence investigation, an agreement to purchase the assets of VPB in the receivership action, and Renee and Mark signing noncompete agreements. In the *Independent Bank* action, SRVAN objected to the sale of VPB assets, claiming ownership of some of them. Ultimately, the court ordered liquidation of VPB's assets, and the money obtained was not enough to satisfy VPB's debts.

On January 5, 2012, SRVAN brought the instant action against defendants, alleging tortious interference with business relationship, fraud, and conversion. SRVAN later added claims for violations of Michigan's Uniform Trade Secrets Act and business defamation. The case was assigned to Judge Gill.

On January 26, 2012, Judge Sheeran transferred the case to himself. He indicated in his order that the case shared "substantial and controlling questions of law and fact" with the *Independent Bank* receivership action.

On February 3, 2012, defendants filed a countercomplaint, alleging that SRVAN and Mark Van Poppelen engaged in tortious interference with contract, and seeking specific performance of the asset purchase agreement. They filed a third-party claim against Mark and Renee for breach of the noncompete agreements and tortious interference.

In the course of discovery, SRVAN alleged that defendants failed to turn over requested documents. SRVAN filed motions for default judgment as a discovery sanction. The discovery dispute centered on computer disks containing defendants' files and documents. SRVAN claimed that the files were not accessible on the disks, and alleged that William Hunt deleted data from the disks that were copied and produced to SRVAN in discovery. SRVAN also complained that Hunt fabricated an employment agreement with Mark Van Poppelen, used proprietary information for his own business, obstructed retrieval of property, and failed to appear at corporate depositions. Judge Sheeran found the motion for default judgment

premature, but warned defendants that failure to promptly respond to outstanding discovery would subject them to potential sanctions.

Following an evidentiary hearing on March 20 and March 21, 2013, Judge Sheeran found that William Hunt tampered with and attempted to delete certain electronic data. As a discovery sanction, Judge Sheeran dismissed defendants' counterclaim and third-party claim of tortious interference and further found that Mark Van Poppelen was entitled to an adverse inference instruction on defendants' third party breach of employment contract claim. Judge Sheeran further ordered that SRVAN was entitled to an adverse evidentiary inference on its trade secrets claim. Finally, Judge Sheeran awarded SRVAN reasonable attorney fees and costs for "having to deal with issues and disputes regarding the material deleted from the external hard drive."

Defendants filed an application for leave to appeal from the order on June 6, 2013.

On June 12, 2013, the discovery sanctions order was reduced to a partial judgment in favor of SRVAN.

On May 9, 2013, SRVAN amended its complaint to add Susan Hunt as a defendant. SRVAN alleged that Susan Hunt and William Hunt engaged in "concert of action" and civil conspiracy, and that Susan aided and abetted William.

On June 17, 2013, Susan Hunt moved to disqualify Judge Sheeran on the basis of actual bias or the appearance of bias. She asserted that Judge Sheeran and Mark Van Poppelen used to be neighbors, that their sons grew up playing football together, that Judge Sheeran and Mark were "drinking buddies" with a close personal friendship, and that on several occasions, Mark drove Judge Sheeran home after a night of drinking together. Susan's motion also asserted that Mark boasted to others that Judge Sheeran would rule in his favor if an issue involving him ever came before Judge Sheeran, because of their friendship. Susan cited Mark's deposition testimony in which he admitted that he has given Judge Sheeran rides home after a night of drinking when Judge Sheeran might have had too much to drink. Susan supported her assertions with the affidavit of Herb Nordstrom, an acquaintance of both Judge Sheeran and Mark. Nordstrom attested that he socialized with both men "on numerous occasions" "at the Bell Bar, Old City Hall, or other local Bay City establishments[.]" Nordstrom stated: "I have heard Mark Van Poppelen boast on several occasions that Joe Sheeran would rule in his favor if an issue involving him ever came before Joe Sheeran as a result of the close relationship between the two of them."[3]

Judge Sheeran granted the motion to disqualify. The court's July 13, 2013 order provided: "Counsel met in chambers regarding motion to disqualify. Motion granted. Parties agreed to handle matter in camera." The case was then reassigned to Judge Gill.

---

[3] As will be discussed below, Judge Sheeran unequivocally refuted the allegations in the affidavit and Nordstrom later recanted these claims.

On September 6, 2013, defendants filed a motion to vacate Judge Sheeran's prior rulings in light of his disqualification. Defendants also requested re-examination of the prior rulings. In the meantime, SRVAN began efforts to enforce the partial judgment. SRVAN moved to compel discovery of the defendants' assets to satisfy the judgment. The Hunt Companies objected, and argued that the partial judgment could not be executed before a final judgment was entered.

Judge Gill heard argument on all three motions on October 29, 2013. Finding no actual bias on the part of Judge Sheeran, Judge Gill denied the motion for vacatur. Finding clear evidence that defendants engaged in a pattern of interference, Judge Gill denied the motion for reexamination. Finally, Judge Gill granted SRVAN's motion to compel discovery to collect on the partial judgment.

On appeal, defendants seek review of Judge Sheeran's April 18, 2013 order granting discovery sanctions and his June 11, 2013 order granting partial judgment in favor of SRVAN. They also seek review of Judge Gill's three November 14, 2013 orders denying their motion to vacate an April 18, 2013 sanctions order and a June 11, 2013 partial judgment, denying their motion for reexamination, and granting plaintiff SRVAN's motion to compel discovery.

## II. DISCOVERY SANCTIONS

Defendants argue that Judge Sheeran abused its discretion in imposing discovery sanctions because the sanctions were not proportionate, just or warranted. We disagree.

"The standard of review for decisions regarding sanctions for discovery violations is abuse of discretion. An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Jilek v Stockson*, 297 Mich App 663, 665; 825 NW2d 358 (2012). "This Court reviews any factual findings underlying a trial court's decision for clear error. A finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake has been made." *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 660; 819 NW2d 28 (2011) (internal citations and quotations omitted).

While MCR 2.313(B)(2)(c) authorizes a trial court to enter a default judgment or dismiss an action, this Court has warned that "a default entered as a sanction is a means to penalize a party for failure to comply with the trial court's directives and, as noted above, should be entered only in the most egregious circumstances." *Kalamazoo Oil Co v Boerman*, 242 Mich App 75, 87; 618 NW2d 66 (2000).

> The trial court should carefully consider the circumstances of the case to determine whether a drastic sanction such as dismissing a claim is appropriate. Severe sanctions are generally appropriate only when a party flagrantly and wantonly refuses to facilitate discovery, not when the failure to comply with a discovery request is accidental or involuntary. The record should reflect that the trial court gave careful consideration to the factors involved and considered all its options in determining what sanction was just and proper in the context of the case before it. [*Id.* at 86 (internal citations and quotation marks omitted).]

Because the courts generally prefer that matters be decided on the merits, dismissal "should be taken cautiously." *Vicencio v Ramirez*, 211 Mich App 501, 506-507; 536 NW2d 280 (1995). Thus:

> Before imposing the sanction of a default judgment, a trial court should consider whether the failure to respond to discovery requests extends over a substantial period of time, whether an existing discovery order was violated, the amount of time that has elapsed between the violation and the motion for a default judgment, the prejudice to defendant, and whether [willfulness] has been shown. [*Thorne v Bell*, 206 Mich App 625, 632-633; 522 NW2d 711 (1994).]

Other factors include "whether the violation was wilful or accidental," "the party's history of refusing to comply with discovery requests" and "whether there exists a history of [] deliberate delay." *Richardson v Ryder Truck Rental, Inc*, 213 Mich App 447, 451; 540 NW2d 696 (1995). "The sanction of default judgment should be employed only when there has been a flagrant and wanton refusal to facilitate discovery, that is, the failure must be conscious or intentional, not accidental or involuntary." *Frankenmuth Mut Ins Co v ACO, Inc*, 193 Mich App 389, 397; 484 NW2d 718 (1992). "Ultimately, the court's chosen discovery sanction must be proportionate and just." *Hardrick*, 294 Mich App at 662 (internal quotation marks omitted).

In the course of discovery, SRVAN alleged that defendants failed to turn over requested documents. SRVAN filed motions for default judgment as a discovery sanction. The discovery dispute centered on computer disks containing defendants' files and documents. SRVAN claimed that the files were not accessible on the disks, and alleged that William Hunt deleted data from the disks that were copied and produced to SRVAN in discovery. SRVAN also complained that Hunt fabricated an employment agreement with Mark Van Poppelen, used proprietary information for his own business, obstructed retrieval of property, and failed to appear at corporate depositions.

At a February 20, 2013 hearing on SRVAN's motion for default judgment, the trial court noted:

> In one respect, I think that the motion [for default judgment] is premature. I know that allegedly some mass quantity of information has now been provided by the copying of the computer records, but they've been inaccessible. It remains to be seen whether or not those records contain what they are alleged to contain. For example, are – are the invoices – are all the invoices really on that computer. So we've taken some steps today to allow counsel to get some information as to how to access that information out of the electronic records that've been copied, and I'd like, before I decide this, to know the results of that.

> Suffice it to say that *the defendants are warned that any future violation of discovery orders,* and there have been violations of the discovery orders, I don't know that I agree with every single instance cited by counsel that they're all violations, but *there have been violations, and they are delaying this – the preparation of this matter, and defendant is warned that any future violations could result in severe sanctions, including dismissing the cases the defendant has*

-6-

*brought, and entering default judgments against them in the cases that the plaintiffs have brought.*

Defendants were given until the end of the week to produce the requested information along with the mechanism for accessing that information. The trial court added, "just to be clear then, for the balance of the relief requested, I will take it under advisement, *pending what happens in the future* and what I'm told about the future, so *the issue of sanctions remains open*."

The parties stipulated that the Mas90 program was deleted from the external hard drive on November 27 at approximately 2:00 a.m., prior to being delivered to plaintiffs. The question was who was responsible. At an evidentiary hearing on March 20 and 21, 2013, the court heard testimony from several witnesses regarding how information may have been deleted from the disc and who might have been responsible. Judge Sheeran found that William Hunt tampered with the external hard drive after it was copied:

> The person who had access to do this at the time that I believe it happened which I believe is the time indicated that – on the 27th of November was Mr. Hunt. And this has been coming down the pike for some time. There's a lot riding on this. And he hasn't bothered to really examine where he was or what he was doing at that time. He's been vague about that.
>
> Mr. Hewitt [defense counsel] argues that he wouldn't have any motivation to do this. I don't think that's true. I think that a motivation would be to – to *delay proceedings and to make it as difficult and as expensive as possible for the plaintiffs to complete their discovery in this matter*. So, he – he certainly had a [] motivation in that regard.
>
> ***
>
> So, I find that as a matter of fact that Mr. Hunt or someone acting at his direction tampered with this external hard drive after it had been copied by Miss Sellers and removed information from it before it was turned over to his attorney. *Resulting in a failure to comply with discovery*.
>
> There is no indication that this was accidental or done in anything but a – a *willful and deliberate fashion, that it was done with an intent to just delay the proceedings here or to hide from the plaintiffs certain information or to make it as difficult as possible for them to pursue their case or to make it expensive for them*. [Emphasis added.]

Judge Sheeran then proceeded to determine the proper discovery sanction. He asked defense counsel what sanction would be appropriate, indicating that he was required to consider other less drastic sanctions than default and dismissal. Judge Sheeran reiterated:

> I do find that the defendants have violated the discovery rules and the biggest violation is the – the *intentional, willful* deletion of information on the hard drive that we talked about earlier.

I don't believe that was accidental. I believe it was done *willfully and intentionally*, and then when there were difficulties encountered by the plaintiffs in trying to get access to that, it was compounded and – and dragged out by the continuing discussions about how to access information that wasn't there in the first place.

And I think that prolonged the unraveling of that mystery. I don't believe it was prolonged by the – Mr. Jezdimir filing the motion. I think that actually brought it to a head and [] got it to the resolution that [] we have today.

*There have been other discovery violations including deletion of burnishing reports, the deletion of information on the computer regarding the employment agreement it's alleged that Mark Van Poppelen signed, the failure to adequately respond to discovery requests for the basis of the tortious interference with business relation claims that defendants have made. I think that was an intentional refusal to answer or disclose information relative to that claim.*

We have somewhat of a *history here of the – the defendants delaying matters.* It's well outlined in the briefs supplied by the plaintiff how we have a *long and protracted history of refusal to fully comply with – with discovery.*

Defendants *haven't made an attempt to timely cure* the – these defects, either. They just – just haven't. Instead we've been kind of led on a wild goose chase, especially in regard to this getting to the bottom of the missing information on the – from the electronic discovery.

Judge Sheeran then looked to each of the parties' claims to see how they were impacted by the Hunt Companies' discovery violations. He dismissed defendants' claim for tortious interference with business relations. A lesser sanction of a negative inference jury instruction was applied to defendants' claim for breach of contract. The jury could also draw a negative inference regarding missing burnishing reports on the claim for violation of trade secrets. Judge Sheeran went on:

But because of – of the *willful and deliberate and serious violation of deleting the information from – from the hard drive, I believe that the deletion of that information has made it impossible for the plaintiffs to properly prosecute their claims and they've been seriously prejudiced as to their claims for tortious interference and also for the conversion claim.*

And so I believe that the appropriate remedy in those matters is to enter default judgment in favor of the plaintiff on those – those two claims. Tortious interference and the conversion.

As to the other claims of plaintiff, I don't think that they were affected to the degree and I would deny to grant default judgments as to the other counts.

On April 18, 2013 Judge Sheeran reduced his findings into a written order, which granted SRVAN default judgment on its claims of tortious interference and conversion. Judge Sheeran

-8-

dismissed defendants' counterclaim and third-party claim of tortious interference and further found that Mark Van Poppelen was entitled to an adverse inference instruction on defendants' third party breach of employment contract claim. Judge Sheeran further ordered that SRVAN was entitled to an adverse evidentiary inference on its trade secrets claim. Finally, Judge Sheeran awarded SRVAN reasonable attorney fees and costs for "having to deal with issues and disputes regarding the material deleted from the external hard drive."

MCR 2.313(B)(2)(c) clearly authorized Judge Sheeran to enter a partial default judgment and dismissal in this case. This was clearly a situation involving particularly "egregious circumstances." William Hunt acted deliberately in deleting critical data. Judge Sheeran found that his actions were calculated to delay the proceedings and intentionally hide information from plaintiff. Any subsequent "attempt to cure" by providing a disc with the relevant information was, in fact, no attempt at all. There was not some accident that prevented defendants from transmitting the correct information; rather, it was a deliberate attempt to hide information. Plaintiff and Mark Poppelen were clearly prejudiced by these flagrant violations with trial only a few weeks away. Judge Sheeran plainly contemplated other drastic sanctions and, in fact, ordered lesser sanctions on some of the counts. As SRVAN points out, defendants provide no legal support for their argument that "lack of merit" of a claim is a factor to consider in ordering discovery sanctions. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Defendants' actions were flagrant and wanton. There was also a history of failing to or refusing to comply with discovery requests. Under these circumstances, Judge Sheeran's chosen discovery sanction was proportionate and just.

## III. VACATUR

Defendants argue that Judge Gill abused his discretion when he denied their motion for vacatur. Defendants claim that Judge Sheeran's disqualification after entering a default judgment against defendants demonstrated judicial bias. We disagree.

A trial court's determination on a motion to vacate is reviewed for an abuse of discretion. *CD Barnes Assoc, Inc v Star Heaven, LLC*, 300 Mich App 389, 425; 834 NW2d 878 (2013).

At the October 29, 2013 hearing on defendants' motion for vacatur, defense counsel argued that a showing of actual bias was not necessary to justify vacating Judge Sheeran's sanctions order and partial judgment. Counsel cited *Liljeberg v Health Services Acquisition Corp*, 486 US 847; 108 S Ct 2194; 100 L Ed 2d 855 (1988) and *Caperton v Massey*, 556 US 868; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), highlighting "the risk of undermining the public's confidence in the judicial process."

Judge Gill questioned defense counsel about defendants' failure to move to disqualify Judge Sheeran in a timely manner. Judge Gill read from an August 8, 2011 transcript and a January 30, 2012 transcript in the *Independent Bank* receivership case. In the first proceeding, Judge Sheeran disclosed that he was friends with Mark Van Poppelen. Defendants were not parties to the *Independent Bank* case at that point. At the January 2012 proceeding, counsel for

defendants was present, and an attorney representing Independent Bank, Ms. Swisher, referred to Judge Sheeran's prior "comment about a relationship between [Judge Sheeran] and [ ] Mr. Van Poppelen." Attorney Swisher asked that the court "consider whether or not a reassignment would be appropriate." Judge Gill suggested that these transcripts indicated that William Hunt had notice of Judge Sheeran's relationship with Mark Van Poppelen from proceedings in the *Independent Bank* case.

Defense counsel emphasized that nothing that Judge Gill read from the January 30, 2012 transcript in that case mentioned that the men were drinking buddies or that Judge Sheeran received rides home from Mark Van Poppelen after nights of drinking. Counsel argued that the nature and depth of the friendship came to light much later, and "prompted an immediate recusal without explanation from the judge." Defense counsel summarized his argument:

> But the standard here is a higher one as the Liljeberg case sets out. It's what does this chronology of events communicate to the public? What does it say to the public where a judge sets aside motions on the merits, decides motions based on discovery abuses and then recuses himself from the case?
>
> Well, I'd say that for someone in the public, John and Mary Doe who really rely on blind faith that the – that the judicial system will work the way it's supposed to work, the answer to the question of what does it communicate to them is a rhetorical one.
>
> In fact, I think it discloses an answer that is the public's worst nightmare. It communicates that this decision was one that was influenced by bias and it communicates the conclusion that justice is not blind – and this is the nightmare – but that it depends on who you know. It depends on who you know.
>
> And I will say this. Judge Sheeran's recusal, for whatever reason he decided to do it, if – for the reasons set forth in Mr. Nordstrom's affidavit that says that he was a long-time friend and drinking buddy of Mr. Van Poppelen, –
>
> ***
>
> . . . But this is a case that screams out for resolution on the merits and not resolution under the circumstances here that as I suggested to you would deeply erode public confidence in this court and our judicial system generally.

Judge Gill also referred to a third case in which Bay Block is a defendant, and over which Judge Sheeran presided. In that case, *Transworld Materials v Bay Block*, circuit court no. 12-003485-CZ, Judge Sheeran sua sponte recused himself on October 28, 2012. In so doing, Judge Gill noted that Judge Sheeran "went into a long, detailed explanation as to why he recused himself in *this* case."

In denying the motion for vacatur, Judge Gill noted:

THE COURT: The defendants' motion essentially argues that because Judge Sheeran disqualified himself it follows as a matter of law that any orders he entered must be vacated.

That is not the law. And I will deny the motion on that basis, to the extent it is on that basis.

*** 

The law essentially is in Michigan that in order to vacate the opinions, you must show that the [ ] judgments were, in fact, the result of the bias or prejudice.

I want to address the facts that [ ] exist in this case.

First of all, Judge Sheeran did not make any secret of what had occurred in the past between Mr. Van Poppelen and himself. The first proceeding that I'm aware of that occurred in this case was on August the 20th (sic) 2011.[4] I have a copy of the transcript that has been certified by the court reporter and it is my understanding that that was the first hearing in the matter . . .

*** 

And then it goes on. The point is, there was nobody that raised a motion then, the parties at that time did not include Mr. Hunt or his corporations.

But there was another hearing on January the 30th, 2012[5] where WB Hunt Corporation was clearly a party and was present at the hearing in the person of Mr. Nelson Ropke, a lawyer with Miller, Canfield, Paddock and Stone.

I've already read into the transcript – into the record that transcript, but for purposes of summary, Miss Swisher, the lawyer for Independent Bank again raised the issue of Judge Sheeran's relationship with Mr. Van Poppelen and asked him to reconsider it. No other lawyer said anything and no motion followed and this is before any of the orders were entered by Judge Sheeran that affected that litigation at – or at least the issues here, the default orders, et cetera.

And then yesterday, Judge Sheeran was confronted in the case of Transworld [ ] Materials, LLC versus Bay Block, File 12-[3485] with a motion, I believe to add Mr. Van Poppelen as a third party-defendant.

---

[4] Although Judge Gill refers to the August 2011 proceedings as a part of "this case," he is quoting Judge Sheeran from the transcript in the *Independent Bank* case, of a proceeding that occurred before defendants became involved in that case.

[5] To be clear, this January 2012 transcript is also from the *Independent Bank* case.

Judge Gill quoted Judge Sheeran's remarks from the previous day in the *Transworld Materials* case wherein Judge Sheeran explains that his recusal was based solely on Susan Hunt's request and the appearance of impropriety. He refuted the facts set forth in Nordstrom's affidavit. Judge Sheeran acknowledged that Mark was a former neighbor and that they were on friendly terms, but they were not close personal friends and Judge Sheeran was not biased in Mark's favor. Nevertheless, Judge Sheeran believed that his recusal would serve "both the integrity of the Court and the appearance of justice."

Judge Gill concluded:

Now, I realize those comments weren't made at the time of [ ] the disqualification. However, I'm going to deny the motion for the following reasons.

First, I do not think there has been any proof that Judge Sheeran actually was biased or that any of the opinions that he rendered or the orders that he entered were based on bias or any personal relationship with any of the litigants.

\*\*\*

Second, I find that the defendants WB Hunt and Mr. Hunt personally because of his ownership of Bay Block were on notice of this well before these [ ] issues were decided and chose not to act. I base that on the fact that although he was not a party on the hearing of August 8, 2011, and when I say "he," I'm referring to Hunt Corp – the WB Hunt Corporation and/or Mr. Hunt personally, he certainly was or the corporation was as of January 30th, 2012. And he had, in the interim between those two hearings, purchased [ ] Bay Block, Inc. And so he was on notice.

\*\*\*

I have reviewed the proceedings of the hearings that led to this over several, several months. And I find that Judge Sheeran's conclusions were based on a significant record and well based on fact.

He found that the defendants violated the discovery rules and the biggest violation was the intentional willful deletion of information on the hard drive that we talked about earlier . . .

I'm not going to go into a minced detail of each and every hearing or each and every alleged violation of the discovery rules, but Judge [Sheeran] gave careful and thorough consideration to all of the arguments that were made and all of the evidence that was before him, and as a – and made his rulings only after he was confronted with, I think, very persuasive forensic evidence that led him to the conclusion that Mr. Hunt had deliberately deleted information from a hard drive or [] from the electronic disclosures that were made to the plaintiff pursuant to [] discovery requests.

-12-

That was in conjunction with a long, protracted record of violations. And he, I think, gave very thorough thought to what he decided and that he made a ruling that in spite of its severity and harshness was well founded on the facts and within his discretion to grant.

I see nothing in those proceedings which in any way indicate a bias, actual or implied, on the part of Judge Sheeran. In fact, he had been asked on many occasions before he did enter the sanctions that he entered to grant sanctions including default and he had declined to do so until he saw further proofs.

I think that under the case law in Michigan, there [ ] must be a showing that those decisions were based or stem from some bias or prejudice and there is none in this record.

*** 

There is nothing in the record to indicate to me or any reasonable observer that Judge Sheeran's opinions were formed on the basis of anything other than clear evidence that Wi – WB Hunt Corporation and Mr. Hunt personally were engaged in a long, protracted, deliberate attempt to obstruct the discovery process and to im – delay the proceedings or to alter the results by hiding information and evidence that should have been produced.

For those reasons, I deny the motion to vacate Judge Sheeran's orders.

As for the motion to reexamine, Judge Gill concluded:

[T]he conclusions reached by Judge Sheeran were based on clear evidence of a deliberate and continuing pattern by Mr. Hunt and his corporation to interfere with the discovery and to obstruct the proceedings.

I think the number of hearings that were conducted before Judge Sheeran reached that conclusion was clear evidence that he considered lesser sanctions. I think he was looking for said lesser sanctions. I think he wanted the obstruction to stop. And when it didn't, he, I think, entered a very reasonable order.

In *Caperton*, a justice on West Virginia's Supreme Court declined to recuse himself from hearing a case that involved an individual who had contributed extraordinary amounts to the justice's election campaign. In finding that failure to recuse was an error, the United States Supreme Court acknowledged that there are "circumstances in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton*, 556 US at 877 (internal quotation marks and citation omitted). The Court accepted the justice's "probing search into his actual motives and inclinations" and did not dispute "his subjective findings of impartiality and propriety." *Id.* at 882. Nevertheless, the Court explained:

The difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules. Otherwise

-13-

there may be no adequate protection against a judge who simply misreads or misapprehends the real motives at work in deciding the case. The judge's own inquiry into actual bias, then, is not one that the law can easily superintend or review, though actual bias, if disclosed, no doubt would be grounds for appropriate relief. In lieu of exclusive reliance on that personal inquiry, or on appellate review of the judge's determination respecting actual bias, the Due Process Clause has been implemented by objective standards that do not require proof of actual bias. In defining these standards the Court has asked whether, under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented. [*Id.* at 883-884.]

The Court found that not all campaign activity will render a judge incapable of hearing a case, but that the focus must be on "the contribution's relative size in comparison to the total amount of money contributed to the campaign, the total amount spent in the election, and the apparent effect such contribution had on the outcome of the election." *Id.* at 884. The focus must also be on the "temporal relationship between the campaign contributions, the justice's election, and the pendency of the case." *Id.* at 886. Searching for evidence of actual bias is "just one step in the judicial process; objective standards may also require recusal whether or not actual bias exists or can be proved." *Id.* "The failure to consider objective standards requiring recusal is not consistent with the imperatives of due process." *Id.* The Court concluded: "We find that [the third party's] significant and disproportionate influence—coupled with the temporal relationship between the election and the pending case offer a possible temptation to the average judge to lead him not to hold the balance nice, clear and true. On these extreme facts the probability of actual bias rises to an unconstitutional level." *Id.* at 886-887 (internal quotation marks and citations omitted). The Court also noted that several states have untaken reforms to combat not only actual judicial bias, but the appearance of partiality. *Id.* at 888.

Here, Judge Sheeran disqualified himself immediately upon Susan Hunt's request. Therefore, the issue is not whether Judge Sheeran should have disqualified himself under the circumstances. The relevant inquiry is: what becomes of Judge Sheeran's prior orders in light of his subsequent disqualification?

On appeal, defendants argue that Judge Gill erred in applying an "actual bias" standard. Defendants argue that the appropriate standard is the federal standard as articulated in *Liljeberg*, that a showing of actual bias is not necessary to warrant vacatur of a judgment after recusal of the trial judge. In *Liljeberg*, Loyola University was in talks to sell a parcel of land to Liljeberg, who intended to build a hospital. However, in order to build a hospital, Liljeberg needed a "certificate of need" from the State of Louisiana. He claimed he had a certificate of need, but Health Services Corporation filed suit for declaratory judgment against Liljeberg, asking the trial judge to find that it was the owner of the certificate, not Liljeberg. The trial judge entered judgment for Liljeberg. Several months later, Health Services Corporation discovered that the trial judge was a member of the Loyola University Board of Trustees, who had an interest in the litigation. Health Services filed a motion to vacate under FRCP 60(B)(6). *Liljeberg*, 486 US at 852-856.

-14-

In finding the federal statute setting forth judicial disqualification (28 USC 455) had been violated, the Court discussed the proper remedy. The Court noted that, "[a]s in other areas of the law, there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance. There need not be a draconian remedy for every violation of § 455(a)." *Liljeberg*, 486 US at 862.

> We conclude that in determining whether a judgment should be vacated for a violation of § 455(a), it is appropriate to consider [1] the risk of injustice to the parties in the particular case, [2] the risk that the denial of relief will produce injustice in other cases, and [3] the risk of undermining the public's confidence in the judicial process. We must continuously bear in mind that to perform its high function in the best way justice must satisfy the appearance of justice. [*Liljeberg*, 486 US at 864 (internal quotation marks and citation omitted).]

Even accepting that, at the time the case was tried, the district court judge did not have actual knowledge of Loyola's interest in the dispute, "[t]he problem, however, is that people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges. The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible. Thus, it is critically important in a case of this kind to identify the facts that might reasonably cause an objective observer to question [the judge's] impartiality." *Liljeberg*, 486 US at 864-865 (internal footnote and citations omitted). The Court then considered four factors in particular. First, it was remarkable that the district court judge simply "forgot" about Loyola's interest. *Id.* at 865. Second, an unfortunate coincidence existed wherein the district court judge, who regularly attended board meetings, was not present at a meeting following the two-day trial while the case was still under advisement. Third, the Court found it "remarkable – and quite inexcusable" for the judge to fail to recuse himself after learning of the conflict. *Id.* at 866. Finally, the district court judge failed to acknowledge he had known about Loyola's interest shortly before and after trial, nor did he indicate an awareness of a duty to recuse himself. *Id.* at 867.

The Court quoted the Court of Appeals' opinion with approval:

> "The goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible. The judge's forgetfulness, however, is not the sort of objectively ascertainable fact that can avoid the appearance of partiality. Under section 455(a), therefore, recusal is required even when a judge lacks actual knowledge of the facts indicating his interest or bias in the case if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge." [*Liljeberg*, 486 US at 860, quoting *Health Services Acquisition Corp v Liljeberg*, 796 F 2d 796, 802 (CA 5 1986).]

Defendants are correct – a showing of actual bias is not necessary to warrant vacatur of a judgment after recusal of the trial judge. *Liljeberg* clearly provides that the appearance of

partiality may be sufficient to warrant disqualification even in the absence of actual bias. However, *Liljeberg* does not suggest that vacatur is mandated even when there *is* the appearance of partiality. Quite the opposite is true. The Court carefully noted that "there is surely room for harmless error" and that "[t]here need not be a draconian remedy for every violation of" the rules for judicial disqualification. *Liljeberg*, 486 US at 862. The Court, even after finding that there was the appearance of partiality based on the district court judge's affiliation with Loyola, did not end its inquiry there; instead, the Court went on to consider relevant factors to fashion a proper remedy.

The case at bar is distinguishable from *Liljeberg* in a number of ways. First, the conflict in *Liljeberg* was directly connected to the district judge's ruling. Loyola, where the judge was a trustee, derived a financial benefit from the ruling in favor of Liljeberg. In contrast, the alleged conflict here is speculative. Judge Sheeran had no pecuniary interest in the outcome of the proceedings. Second, Judge Sheeran, in a related case, made his connection with Mark Van Poppelen known and specifically sought the attorneys' input on the issue. He did not hide or "forget" about the relationship. Third, Judge Sheeran, unlike the district court judge in *Liljeberg*, immediately disqualified himself when Susan Hunt asked him to do so. He did not attempt to hold onto the case or "explain away" his decision. Fourth, Judge Sheeran, in a related proceeding, explained why he disqualified himself on the record at length. At that time, Judge Sheeran indicated that he was doing so in deference to a newly-added party's request. He flatly denied the bulk of defendants' allegations regarding his relationship with Mark Van Poppelen. Fifth, unlike the party in *Liljeberg*, defendants sat on their claim and failed to act in a timely manner. On appeal, defendants argue that the delay was excused because, although they may have known of the friendship between Judge Sheeran and Mark Van Poppelen, they did not know of the "extent" of the relationship. That argument is disingenuous, especially in light of the fact that Herb Nordstrom later recanted the bulk of his affidavit, upon which defendants relied. Finally, the record is bereft of any indication that Judge Sheeran showed favoritism to plaintiff or Mark Van Poppelen. Defendants complain that the default and dismissal was a hasty decision and that the trial court ignored their pending motion for summary disposition. However, as noted in Section II of this opinion, the default and dismissal were well-justified following dilatory, evasive, and obstructive behavior.

In light of these considerations, the three factors set forth in *Liljeberg* for deciding whether relief from judgment is warranted – "[1] the risk of injustice to the parties in the particular case, [2] the risk that the denial of relief will produce injustice in other cases, and [3] the risk of undermining the public's confidence in the judicial process" – preclude vacatur in this case. The particular facts of this case would not reasonably cause an objective observer to question Judge Sheeran's impartiality. It follows that Judge Gill did not abuse his discretion when he denied defendants' motion for vacatur.

Moreover, although Judge Gill was careful to separate out the motions, it appears that he did, in fact, reexamine Judge Sheeran's prior orders and found them well-grounded in fact and law. Unlike the parties in *Liljeberg*, a new judge was able to take a fresh look at Judge Sheeran's prior rulings. As discussed at length in Section II, Judge Sheeran's order of default and dismissal were appropriate under the circumstances of this case.

IV. ENFORCEMENT OF THE PARTIAL JUDGMENT

Finally, defendants argue that the trial court erred in permitting execution and collection activity on an interim partial judgment. They point to MCR 7.108(B)(1), which provides that an execution may not take place until the time has expired for an appeal as of right and, because an appeal of right may only be taken from a final judgment, execution may not take place on a partial, interim judgment. We disagree.

Whether the trial court erred in allowing execution on the partial judgment is a question of law that is reviewed de novo on appeal. *Whitman v City of Burton*, 493 Mich 303, 311; 831 NW2d 223 (2013). "Issues involving the interpretation of court rules are also reviewed de novo as questions of law." *Id.*

This Court interprets court rules using the same principles that govern statutory interpretation. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). "When ascertaining the meaning of a court rule, the reviewing court should focus first on the plain language of the rule in question, and when the language of the rule is unambiguous, it must be enforced as written." *Acorn Investment Co v Michigan Basic Property Ins Ass'n,* 495 Mich 338, 350; 852 NW2d 22 (2014).

On June 11, 2013, Judge Sheeran entered an order for "Partial Judgment in Favor of SRVan Brick & Stone, Inc." The order provided:

> This matter came before the Court upon SRVan Brick & Stone, Inc.'s ("SRVan") motion for attorneys' fees and costs pursuant to the April 18, 2013 Order Granting in Part and Denying in Part the Renewed Motion for Default and Dismissal, the Court having read the filings, heard oral argument, and otherwise being full[y] advised in the premises,
>
> **IT IS HEREBY ORDERED** that SRVan's motion for a partial judgment of attorneys' fees and costs is granted in part and a partial judgment is entered in favor of SRVan against Defendants William B. Hunt, WB Hunt Corp., and Bay Block, LLC in the sum of $32,707.98, which is an award of $27,846.00 in attorneys' fees, $2,892.21 in fees for the time of Renee Van Poppelen, and $1,969.77 in costs.

This Judgment does not resolve all pending claims and does not close the case.

SRVAN and Van Poppelen sought to execute on the judgment, citing MCR 2.614(A)(1), which provides:

> (1) Except as provided in this rule, execution may not issue on a judgment and proceedings may not be taken for its enforcement until the expiration of 21 days after its entry. If a motion for new trial, a motion for rehearing or reconsideration, or a motion for other relief from judgment is filed and served within 21 days after entry of the judgment or within further time the trial court has allowed for good cause during that 21-day period, execution may not issue on the judgment and proceedings may not be taken for its enforcement until the expiration of 21 days after the entry of the order deciding the motion, unless otherwise ordered by the court on motion for good cause.

-17-

Defendants argue that MCR 2.614(D) is applicable, which provides that "Stay on appeal is governed by MCR 7.101(H), 7.209, and 7.302(G)." Contrary to defendants' assertions, MCR 7.101(H), which has been replaced with MCR 7.108(B)(1)[6] does not apply to the case at bar because subchapter MCR 7.101 *et seq* "govern appeals to the circuit court." MCR 7.101(A). The plain language of the rule precludes application in this case. Defendants cite *Cavaliere v DiLorenzo*, unpublished opinion of the Court of Appeals, issued January 8, 2008 (Docket No. 271663), wherein this Court has previously applied the 7.100 series of the court rules to appeals in this Court – "[p]ursuant to MCR 7.101(H)(1), 'an execution may not issue and proceedings may not be taken to enforce an order or judgment until the expiration of the time for taking an appeal under subrule (B).'" *Cavaliere,* slip op p 6. *Cavaliere* is an unpublished decision and, therefore, has no precedential value. MCR 7.215(C)(1). Moreover, upon closer examination, we conclude that MCR 7.101(H)(1) applies only to appeals to the circuit court.

That leaves defendants with the only applicable rule cited in MCR 2.614(D) – MCR 7.209, which provides: "Except for an automatic stay pursuant to MCR 2.614(D), an appeal does not stay the effect or enforceability of a judgment or order of a trial court unless the trial court or the Court of Appeals otherwise orders." MCR 7.209(A)(1). At the time of the motion, this Court had not granted defendants' application for leave to appeal. There were no orders staying enforcement. As such, the trial court's judgment awarding costs and fees was subject to execution.

Affirmed.

/s/ Christopher M. Murray
/s/ Henry William Saad
/s/ Kirsten Frank Kelly

---

[6] MCR 7.108(B)(1) provides: "Automatic Stay. Unless otherwise provided by rule, statute, or court order, an execution may not issue and proceedings may not be taken to enforce an order or judgment until expiration of the time for taking an appeal of right."