*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————

**UNITED STATES**
Appellee

**v.**

**Thomas H. TAPP, Private First Class**
United States Marine Corps, Appellant

**No. 23-0204**
Crim. App. No. 202100299

Argued March 5, 2024—Decided July 24, 2024

Military Judges: Derek A. Poteet (arraignment),
John P. Norman (trial), Kevin Scott Woodard
(post-trial motion), and Glen Ray Hines Jr.
(sealing orders and entry of judgment)

For Appellant: *Lieutenant Christopher B. Dempsey*,
JAGC, USN (argued); *Lieutenant Megan E. Horst*,
JAGC, USN, and *Captain Colin W. Hotard,* USMC.

For Appellee: *Lieutenant Michael A. Tuosto*, JAGC,
USN (argued); *Colonel Joseph M. Jennings*, USMC,
*Lieutenant Colonel James A. Burkart*, USMC, and
*Brian K. Keller*, Esq. (on brief); *Lieutenant James P.
Wu Zhu*, JAGC, USN.

Chief Judge OHLSON delivered the opinion of the
Court, in which Judge SPARKS, Judge MAGGS,
Judge HARDY, and Judge JOHNSON joined.

———————

Chief Judge OHLSON delivered the opinion of the Court.

In July of 2018, Appellant and another Marine simultaneously sexually assaulted an intoxicated sixteen-year-old girl in a barracks room, leaving her with internal and external injuries requiring hospitalization. Following a contentious six-day trial in February of 2021, members sitting as a general court-martial convicted Appellant of two offenses, one of which was sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2018). In addition to other penalties, the members sentenced Appellant to three years of imprisonment.

Immediately following the trial but without defense counsel present, the military judge held an impromptu ex parte session with trial counsel. He criticized trial counsel's performance, to include the fact that they had asked the panel members to impose a period of confinement of "only" eleven years. Trial counsel soon notified the defense of this ex parte session. The defense counsel then moved to disqualify the military judge from further proceedings, citing both the ex parte session as well as other comments and rulings made by the military judge during trial.

At a post-trial Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2018), session to address the defense motion, the military judge denied any bias or partiality. However, he recused himself from the remainder of the proceedings. Thereafter, a different military judge, Colonel (Col) Woodard, was assigned to the case. He denied the defense motion, concluding that the military judge's rulings and comments during and after trial did not display any actual or apparent bias against Appellant. Col Woodard further concluded that, even assuming the military judge was disqualified, no remedy was warranted under *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988). The United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) subsequently held that "no error materially prejudicial to Appellant's substantial rights occurred" and affirmed the findings and sentence in this case. *United States v. Tapp*,

83 M.J. 600, 625 (N-M. Ct. Crim. App. 2023). We granted review to determine whether Appellant was "deprived of his constitutional right to an impartial judge." *United States v. Tapp*, 83 M.J. 491 (C.A.A.F. 2023) (order granting review).

We are required to apply an abuse of discretion standard to Col Woodard's post-trial analysis. And upon doing so, we hold that there is an insufficient basis to conclude that Col Woodard abused his discretion when he determined that relief is not warranted in this case. Consequently, we answer the granted issue in the negative and affirm the decision of the NMCCA.

## I. Background

### A. The Underlying Offenses

Appellant and another Marine, Private First Class (PFC) Hanley, met A.N., a sixteen-year-old high school student, on a beach in Oceanside, California. Appellant and PFC Hanley invited A.N. to accompany them back to their barracks on nearby Marine Corps Base Camp Pendleton, California. During an Uber ride back to the barracks, Appellant, PFC Hanley, A.N., and a fourth Marine began drinking from a bottle of vodka and PFC Hanley kissed A.N. and put his fingers in her vagina. Upon arriving at the barracks, Appellant, PFC Hanley, and A.N. consumed more alcohol and A.N. became visibly intoxicated. PFC Hanley later testified under a grant of immunity that Appellant had sexual intercourse with A.N. on the floor of the barracks while PFC Hanley orally sodomized her. At some point, A.N. began bleeding from her vagina and became nonresponsive. After being unable to wake A.N., PFC Hanley and Appellant summoned another Marine with medical training to attempt to revive her.

Meanwhile, A.N.'s mother became worried when A.N. failed to arrive home by a prearranged time and noticed through an iPhone tracking application that A.N. was on Camp Pendleton. She contacted Camp Pendleton law enforcement and asked them to conduct a welfare check at A.N.'s location. Upon arrival at the barracks, law

enforcement found A.N. unconscious and bleeding on the bathroom floor, a twelve-to-eighteen-inch puddle of blood on the barracks room floor, vomit on the wall and the floor, and Appellant passed out on the bed. A.N. woke up in the hospital the following morning suffering from painful internal and external injuries.

Appellant was subsequently charged with violating a lawful general order by consuming alcohol while under the age of twenty-one, and with sexual assault without consent, in violation of Articles 92 and 120, UCMJ, 10 U.S.C. §§ 892, 920 (2018).

### B. The Trial

Lieutenant Colonel Norman (hereinafter the military judge) was detailed as the military judge for the trial in this case and presided over all sessions of the court-martial except for arraignment and the final post-trial Article 39(a) session. Appellant argues that throughout the course of the court-martial, the military judge made rulings and comments which demonstrated bias against Appellant. For example, after a third counsel was detailed to represent Appellant, the defense team filed a Military Rules of Evidence (M.R.E.) 412 motion three weeks before trial. The military judge expressed his frustration with this development because he believed the M.R.E. 412 issue "was litigated previously in this case" and the motion was filed late per his trial management order. During an Article 39(a) session, the military judge stated that the behavior of the defense counsel was "not . . . professional" and questioned why Appellant was assigned three counsel when "the accused is not indigent under the UCMJ" and the Rules for Courts-Martial (R.C.M.) "rates [him] one free counsel." He asked if the government could "get away" with "add[ing] a counsel who just starts to reassess and change the whole dynamic of the case and give[s] new notices of new issues," and he questioned whether defense counsel's behavior warranted "censure, contempt, [or] reporting to state bars." Despite a "lack of diligence and lack of good cause attached to the whole defense team," the military judge stated that "the Court will not hold this against the accused himself"

especially given that it was "an issue of [a] constitutional admission [sic]." He then ruled on the merits of the motion, albeit contrary to Appellant's position.

Appellant also points to the military judge's various admonishments of defense counsel throughout the course of the trial. For example, the military judge rebuked defense counsel for what he saw as an untimely response to a motion in limine, accusing them of "l[ying] in wait," and questioning whether defense counsel "know or couldn't understand or perceive or figure out, as a basically qualified defense counsel, that one of the things you might want to do is suppress the accused's statement where he makes inculpatory admissions." Although he deemed the motion "untimely," the military judge ultimately ruled on the motion "for [Appellant's] sake, and not for [defense counsel's] sake."

The military judge further chastised defense counsel for being "glib" in response to a comment made during an Article 39(a) session regarding an expert consultant. He also "counseled both sides" for repeated "electronic communication or consultation over the bar." In addition to comments made to defense counsel, the military judge admonished trial counsel for the poor "standard of appearance" of Appellant (who was in pretrial confinement) and unfavorably critiqued trial counsel's examination of a witness.

The military judge served as neither the finder of fact nor the sentencing authority for Appellant's case. Instead, a panel of officer and enlisted members found Appellant guilty of one specification of violating a lawful general order in violation of Article 92, and one specification of sexual assault in violation of Article 120. Appellant faced a maximum of thirty-two years of confinement. At sentencing, trial counsel asked the panel to sentence Appellant to eleven years of confinement, a dishonorable discharge, forfeiture of all pay and allowances, and reduction to E-1. Defense counsel argued for nineteen months of confinement. The members ultimately sentenced Appellant to three years of confinement, a dishonorable discharge, forfeiture of all pay and allowances, and reduction to E-1.

Immediately after the trial adjourned on February 20, 2021, and defense counsel had left the courtroom, the lead trial counsel asked the military judge if he would be willing to conduct an after-action brief with both defense and trial counsel, to which the military judge replied "no." Nevertheless, before trial counsel exited the courtroom—and with the court reporter and bailiff still present—the military judge suddenly asked from the bench "if [trial counsel] felt there were 'worse' sexual assault cases than the instant case." One of the assistant trial counsel took this inquiry to mean that the military judge "thought it was one of—one of the worst [he had seen]." The military judge then addressed the prosecution team for thirty to forty minutes—which an assistant trial counsel later characterized as an "ass chewing"—during which trial counsel remained standing and the military judge remained seated on the bench.

Trial counsel described the military judge's tone as "pretty aggressive" and an assistant trial counsel described the military judge's demeanor as "angry," noting that she "felt like [the military judge] was just chastising the trial counsel." The military judge was critical of trial counsel's performance, stating that they "should have asked for more confinement, up to and including the max sentence" of thirty-two years of imprisonment, that "[trial counsel] unilaterally decided to 'cap' the sentence by only asking for eleven years of confinement," and that when the Government "caps" the sentence "the Defense have no incentive to avoid contested trials, and that there is no 'price' to be paid by the Defense for their earlier decisions." When an assistant trial counsel stated that, in his experience, eleven years of confinement seemed reasonable, the military judge raised his voice and stated that he had more experience than the assistant trial counsel did. The military judge mentioned that a case such as this one "doesn't come up . . . that often" and discussed some of the aggravating factors of the case—including the age of the victim and that she was found on the barracks room floor in a pool of blood and vomit—and how those facts should have been raised in the sentencing argument. When the military judge concluded

6

what the court reporter later described as a "blasting," trial counsel collected their things and left the courtroom.

Shortly after leaving the courtroom, the lead trial counsel called his supervisor to report on the outcome of the case and to discuss the military judge's ex parte conversation with the prosecution team. After "expressing concern about whether or not [trial counsel] might need to disclose" the ex parte conversation, the lead trial counsel memorialized the conversation in a memorandum for the record which he sent to defense counsel on March 1, 2021. Sometime in early March, the Chief Defense Counsel of the Marine Corps filed an ethics complaint against the military judge. On March 6, defense counsel filed a motion requesting dismissal with prejudice of the findings and sentence or a mistrial because of a violation of the right to an impartial military judge, and disqualification of the military judge from the remainder of the court-martial proceedings.

### C. Post-Trial Sessions and Rulings

At an Article 39(a) session held on March 8, 2021, the military judge stated that he "remained completely impartial throughout this trial and remain[s] impartial now." He stated that he did not believe "there [was] a reasonable appearance of bias based on the totality of the circumstances" and that the ex parte conversation with trial counsel did not support an appearance of bias "particularly, on the facts of this case, where [he] already encouraged the defense to put on a robust sentencing case."[1] He characterized his comments to defense counsel as "frank judicial feedback [which] remains an important aspect of counsel development." The military judge concluded his statement by reasserting that he had been impartial throughout the

---

[1] During an Article 39(a) session held while the panel was deliberating on findings, the military judge expressed concern that defense counsel had "virtually no sentencing case" other than "an unsworn statement by the accused." Accordingly, he once again advised Appellant of his rights regarding sentencing because of the "significant long-term impacts that could result from a conviction on these offenses."

trial and did not believe there was an appearance of bias based upon his behavior, but "to ensure that the accused has confidence in the post-trial process, I have decided to recuse myself from any further post-trial matters." Therefore, he left it to a "new military judge [to] take up any issues from [that] point forward, up to and including" the defense motion for appropriate relief.

Following the military judge's recusal, a new military judge, Col Woodard, was detailed to the case.[2] He then heard testimony from several witnesses regarding the military judge's alleged appearance of bias. Col Woodard called the military judge as a witness, but the military judge invoked his right to remain silent and did not answer any questions.[3] In a written ruling, Col Woodard made a number of findings of fact to include the following: (1) the military judge "has very high standards for all trial litigants and expects counsel before him to meet his high standards"; (2) although the military judge "expressed his frustration and dissatisfaction with [the] defense counsel team for their failure to meet or abide by trial ordered deadlines, . . . without fail, [the military judge] thoroughly considered the merits of the issue[s] raised" by the defense; (3) during the proceedings the military judge not only chastised the defense, he "also expressed his frustration and dissatisfaction with trial counsel and victim's legal counsel (VLC) for their failure to follow Circuit Rules"; (4) the military judge "never stated that the trial counsel should have asked for more than [eleven] years of confinement" but rather "focused his comments on the impact of trial counsel

---

[2] After extensive voir dire of Col Woodard, newly detailed defense counsel challenged him on an "implied bias" theory under R.C.M. 902(a) based upon his previous relationship with the military judge. Col Woodard denied the motion. That issue is not before this Court.

[3] Despite the noncriminal nature of the allegations against the military judge levied in the ethics complaint and in the defense motion to disqualify him, Col Woodard did not require the military judge to answer questions after he invoked his "right to remain silent." That issue also is not before this Court.

arguing for a sentence in a contested members case that is far below the maximum authorized punishment"; (5) the military judge "did not express an[y] displeasure or disagreement with the adjudged sentence," and his critical comments "instead focused on the content, or lack thereof, of trial counsel's sentencing argument"; and (6) the military judge "referenced the defense counsel paying a price for their earlier actions during trial" but "never stated or suggested that any accused or specifically the accused in this case . . . should pay a price."

Based on these findings, Col Woodard concluded that the military judge "possessed no personal bias or prejudice against [Appellant] or the Defense," that the military judge's comments to both trial counsel and defense counsel "were firm but fair," and comments to trial counsel during the ex parte session were a "misguided attempt by [the military judge] to provide objective but pointed critical feedback." He stated that the military judge's ex parte comments "did not focus on the accused, but instead focused on what he viewed as the litigants' short-comings in the representation of their respective clients."

In his written ruling, Col Woodard further stated that "even assuming arguendo [that the military judge's] actions in this trial created an apparent bias," analysis of the facts under the *Liljeberg* factors caused him to conclude that Appellant was not entitled to any relief. In reaching this determination, Col Woodard found or otherwise stated: (1) "the Defense has not identified any specific injustice [Appellant] suffered at the hands of [the military judge]," particularly because the military judge's ex parte comments came "after the members had rendered their verdicts" and thus "there remained no matter of significance in this case where [the military judge] would be called upon to exercise discretion"; (2) the military judge "did not rule uniformly in the Government's favor and he also sustained many of the Defense's objections during the course of the trial"; (3) denial of relief in this case will not produce injustice in other cases because "this court does not condone, or approve of [the military judge's] post-trial ex parte

communication with trial counsel" and the "fallout" from his conduct, to include the filing of an ethics complaint against him, will "no doubt . . . be a teaching point to all military judges and counsel"; and (4) even if the military judge's actions created an appearance of bias, the nature of "that appearance would not create an intolerable risk of undermining the public's confidence in the judicial process." Thus, Col Woodard denied the defense motion.

The convening authority subsequently approved Appellant's sentence and credited him with 215 days of pretrial confinement. Another military judge entered judgment. On appeal, a unanimous panel of the NMCCA affirmed the findings and sentence. *Tapp*, 83 M.J. at 625. We then granted review on the issue of judicial impartiality. *Tapp*, 83 M.J. at 491.

## II. Standard of Review

A military judge's ruling on the issue of judicial impartiality is reviewed for an abuse of discretion.[4] *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000). An abuse of discretion occurs when:

> (1) the military judge predicates a ruling on findings of fact that are not supported by the evidence of record; (2) the military judge uses incorrect legal principles; (3) the military judge applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) the military judge fails to consider important facts.

*United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022) (citations omitted). An abuse of discretion does not mean that "this Court merely would reach a different conclusion" but rather that the military judge's ruling was "arbitrary, fanciful, clearly unreasonable[,] or clearly erroneous." *United States v. Uribe*, 80 M.J. 442, 446

---

[4] The parties agree that this Court is reviewing Col Woodard's ruling on the defense counsel's post-trial motion challenging the impartiality of the military judge, not the NMCCA's ruling.

(C.A.A.F. 2021) (internal quotation marks omitted) (citation omitted).

### III. Applicable Law

### A. Judicial Impartiality

"An accused has a constitutional right to an impartial judge." *United States v. Greatting*, 66 M.J. 226, 230 (C.A.A.F. 2008) (internal quotation marks omitted) (quoting *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001)). Indeed, "the validity of the military justice system and the integrity of the court-martial process 'depend[] on the impartiality of military judges in fact and in appearance.'" *Uribe*, 80 M.J. at 446 (alteration in original) (quoting *Hasan v. Gross*, 71 M.J. 416, 419 (C.A.A.F. 2012) (per curiam)). "'[W]hen a military judge's impartiality is challenged on appeal, the test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt' by the military judge's actions." *United States v. Martinez*, 70 M.J. 154, 157-58 (C.A.A.F. 2011) (alteration in original) (quoting *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000)). To prove judicial bias, a party "must overcome a high hurdle" since there exists a "strong presumption that a judge is impartial." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001).

Under R.C.M. 902, military judges may be disqualified on grounds of an appearance of bias or actual bias. *See United States v. Norfleet*, 53 M.J. 262, 269-70 (C.A.A.F. 2000); *Quintanilla*, 56 M.J. at 76. Disqualification of a military judge under R.C.M. 902 requires a two-step analysis. First, it must be determined "whether disqualification is required under the specific circumstances [of actual bias] listed in R.C.M. 902(b)." *Quintanilla*, 56 M.J. at 45. If these specific circumstances of actual bias do not apply, "the second step asks whether the circumstances nonetheless warrant disqualification based upon a reasonable appearance of bias [under R.C.M. 902(a)]." *Id.*

R.C.M. 902(b) provides five specific grounds that require a military judge to disqualify himself or herself.

These grounds include "where the military judge has a personal bias or prejudice concerning a party." R.C.M. 902(b)(1). Just as in civilian courts, to meet this standard a military judge must demonstrate bias or prejudice at such a "high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Further, "judicial rulings almost never constitute a valid basis for a bias or partiality motion," nor does a judge's "ordinary efforts at courtroom administration," even if these efforts are "stern and short-tempered." *Id.* at 555-56.

Even if actual bias does not arise, "an *appearance* of bias is sufficient to disqualify a military judge." *Uribe*, 80 M.J. at 446 (citing *Norfleet*, 53 M.J. at 270). R.C.M. 902(a) requires a military judge to "disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." This Court applies "an objective standard for identifying an appearance of bias by asking whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015).

### B. The *Liljeberg* Factors

R.C.M. 902(a) is silent on remedies that are available when this Court determines that a military judge failed to recuse himself or herself even though recusal was required because of an appearance of bias. Therefore, this Court applies the three-part test outlined in *Liljeberg* to determine whether "reversal of a decision should be granted as a remedy" when "the judge's impartiality might reasonably be questioned." *Quintanilla*, 56 M.J. at 80-81. The three factors are: (1) "the risk of injustice to the parties in the particular case"; (2) "the risk that the denial of relief will produce injustice in other cases"; and (3) "the risk of undermining public confidence in the judicial process." *Liljeberg*, 486 U.S. at 864.

## IV. Discussion

Exemplary judicial conduct is the sine qua non of a respected, professional, and effective military justice system. Judges are expected to act with "independence, impartiality, integrity, and competence" and to avoid any semblance of "impropriety and the appearance of impropriety" in order to "maintain the dignity of judicial office at all times." Model Code of Jud. Conduct Preamble [2] (Am. Bar Ass'n 2011). "Both the appearance and reality of impartial justice is necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself." *Williams v. Pennsylvania*, 579 U.S. 1, 16 (2016). Indeed, " 'to perform its high function in the best way, justice must satisfy the appearance of justice.' " *Liljeberg*, 486 U.S. at 864 (internal quotation marks omitted) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

### A. Actual Bias

Applying the first step of the two-part test from *Quintanilla*, we conclude that Col Woodard did not abuse his discretion when he determined that the military judge in this case did not display actual bias. As noted above, under the categorical approach outlined in R.C.M. 902(b), a military judge demonstrates actual bias when he or she "has a personal bias or prejudice concerning a party." R.C.M. 902(b)(1). But as Col Woodard observed, the military judge's "remarks, comments, and rulings did not display deep-seated favoritism or antagonism that would make a fair judgment impossible." Rather, throughout the trial the military judge seemed attuned to Appellant's constitutional and statutory rights and took steps to ensure he was treated fairly. There are a number of examples. First, the military judge ruled on defense motions filed outside the deadline of his trial management order "to protect [the] constitutional rights of the accused." Second, when the military judge learned that defense counsel planned to present only an unsworn statement from Appellant during sentencing, he "expressed concern that [Appellant] may not have fully understood the import[ance] of putting on a robust sentencing case." He therefore "confirmed for a second time

that [Appellant] understood his sentencing rights, explaining in detail what extenuation and mitigation entailed and how [Appellant] could put evidence before members for their consideration." And third, during the trial the military judge rebuked the Government regarding the appearance of Appellant (who was in pretrial confinement) and stated that "it's [the Government's] responsibility to have him appropriately attired . . . at these hearings." This action indicates that the military judge was concerned about how Appellant's appearance might adversely affect Appellant during the panel members' deliberations. Under these circumstances, there is an insufficient basis to conclude that Col Woodard abused his discretion when he determined that there was no actual bias here because the military judge "possessed no personal bias or prejudice" against Appellant.

### B. Apparent Bias

Moving to the second step of the *Quintanilla* test, Appellant makes a strong argument that the military judge's actions resulted in an appearance of bias. Indeed, Col Woodard stated in his ruling on the defense motion to disqualify that he did not "condone or approve of [the military judge's] post-trial ex parte communication with trial counsel." The Government counters that no appearance of bias occurred because a reasonable person, knowing all the facts and circumstances, would not reasonably question the military judge's impartiality. A reasonable person, the Government asserts, would recognize that the military judge treated counsel for both sides similarly throughout the trial, there was no evidence of " 'extra-judicial' " bias, such as making comments unrelated to the case, and the conduct in question occurred after the trial was over when the military judge could no longer affect Appellant's due process rights. (Citation omitted.)

Upon considering these opposing views, we are mindful that the Supreme Court has made it clear that even when a judge's conduct rises to the level of apparent partiality, relief is only warranted if the judge's conduct risks injustice to the parties, risks injustice in future cases, and/or

undermines "the public's confidence in the judicial process." *Butcher*, 56 M.J. at 92-93 (internal quotation marks omitted) (quoting *Liljeberg*, 486 U.S. at 864). In light of this precedent, we deem it unnecessary to resolve the dispute between Appellant and the Government about whether there was an appearance of bias. We reach this conclusion because even if we assume without deciding that there was such an appearance, Col Woodard did not abuse his discretion when, after applying the *Liljeberg* factors, he decided that Appellant was not entitled to any relief.

Consistent with the abuse of discretion standard, Col Woodard's *Liljeberg* determination regarding an appearance of impartiality may only be reversed if he predicated his ruling on erroneous findings of fact, he used incorrect legal principles or applied correct legal principles in an unreasonable manner, or he failed to consider important facts when reaching his conclusions. *See Rudometkin*, 82 M.J. at 401.

Appellant preliminarily argues that Col Woodard abused his discretion because he allegedly made multiple erroneous findings of fact in his ruling. Specifically, Appellant writes that Col Woodard's "erroneous findings of fact . . . led to an incorrect conclusion of law in finding the case did not warrant reversal." Brief for Appellant at 63, *United States v. Tapp*, No. 23-0204 (C.A.A.F. Dec. 15, 2023). However, "a military judge's findings of fact . . . will be reversed only if they are clearly erroneous." *United States v. Mizgala*, 61 M.J. 122, 127 (C.A.A.F. 2005). And in order for a finding of fact to be clearly erroneous, there either must be "no evidence to support the finding" or, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Harrington*, 81 M.J. 184, 189 (C.A.A.F. 2021) (citation omitted) (internal quotation marks omitted). Here, after examining the record in depth, we are persuaded that Col Woodard's findings of fact are supported by at least some evidence on the record, and we are not left with a "definite and firm conviction" that an

15

error has occurred. Therefore, we adopt Col Woodard's findings of fact as we progress through the *Liljeberg* factors to determine whether he abused his discretion in reaching his decision in this case.

### 1. First *Liljeberg* Factor: Risk of Injustice to Appellant

For the first *Liljeberg* factor, this Court examines whether there is "any specific injustice that [Appellant] personally suffered." *Martinez*, 70 M.J. at 159. Col Woodard ruled that "the Defense [did] not identif[y] any specific injustice [Appellant] suffered at the hands of [the military judge]," and we conclude that he did not abuse his discretion when he made that determination. Specifically, we concur that the military judge's rulings did not reflect any "deep-seated favoritism or antagonism" against Appellant and instead appear grounded in the law and facts of the case.[5] *Liteky*, 510 U.S. at 555. Indeed, Col Woodard correctly noted that the military judge's expressions of "impatience, dissatisfaction, annoyance, and even potentially anger [were directed] towards counsel on *both* sides of the aisle." (Emphasis added.) Moreover, the military judge did not publicly display bias against Appellant in front of the members, and he properly instructed the panel that they should "disregard any comment or statement or expression made by me during the course of the trial that might seem to indicate any opinion on my part as to whether the accused is guilty or not guilty, since you alone have the responsibility to make that determination."

Col Woodard also did not abuse his discretion when he determined that the military judge's post-trial ex parte session with trial counsel did not pose a risk of injustice to Appellant. We first note that a risk of injustice is "considerably diminished" when the events giving rise to a

---

[5] Further, as discussed on pages thirteen through fourteen *supra*, actions taken by the military judge to ensure that Appellant's rights were protected and that he received fair treatment during the court-martial are applicable to the *Liljeberg* analysis and support Col Woodard's conclusion that Appellant did not suffer a specific injustice at the hands of the military judge.

disqualification claim occur "near the end of [a members] trial, after the presentation of evidence and discussion of instructions on findings" when: (1) a military judge is "not called upon to exercise discretion on any matter of significance concerning findings after that point"; and (2) a military judge's subsequent participation in the sentencing portion of the trial is "limited to instructions and rulings." *Butcher*, 56 M.J. at 92. Here, Appellant was tried and sentenced by members, thereby ameliorating any "risk of injustice" arising from the military judge's actions. Further, the military judge's ex parte comments regarding his displeasure with the Government's approach to sentencing were made after the sentencing occurred—all that remained for the military judge to do in this case was to issue a statement of trial results and, later, to enter judgment. And so, unlike in other cases before this Court where ex parte statements were made prior to or during trial proceedings, the fact that the military judge in this case made his comments at the end of trial weighs against Appellant suffering an injustice. *See, e.g., Martinez*, 70 M.J. at 158-59 (ex parte conversations between supervisory military judge and trial counsel occurred during trial); *Greatting*, 66 M.J. at 230-31 (military judge provided "ex parte critique" to staff judge advocate prior to trial). We therefore conclude that under the first *Liljeberg* factor, Col Woodard did not abuse his discretion when he determined that Appellant did not suffer a "specific injustice" as a result of the military judge's actions.

### 2. Second *Liljeberg* Factor: Injustice in Other Cases

The second *Liljeberg* factor assesses whether "the denial of relief will produce injustice in other cases." 486 U.S. at 864. Stated differently, the second factor requires this Court to consider whether granting relief is necessary in order to compel a judge or litigant to more closely examine possible grounds for disqualification and to handle such matters promptly and properly. *See Uribe*, 80 M.J. at 450 ("[O]ur conclusion that Judge Rosenow abused his discretion will cause military judges in future cases to be appropriately mindful of their obligations under R.C.M. 902.").

Reversal is not always necessary "in order to ensure that military judges exercise the appropriate degree of discretion in the future." *Butcher*, 56 M.J. at 93. Rather, because of the "highly sensitive" nature of the military judiciary—as well as the public nature of opinions from this Court and from the courts of criminal appeals—other forms of admonishment may suffice to preserve confidence in the judicial process. *Id.*

Here, we conclude that Col Woodard did not abuse his discretion when he determined that "granting a remedy would not be necessary to ensure that [this military judge] or other military judges exercise the appropriate degree of discretion in the future." Simply stated, the military judge's conduct has not gone unaddressed. In fact, as noted by Col Woodard:

> Given the fallout from his ex parte communication in this case, which include the filing of a professional responsibility/judicial ethics complaint against him, this Court is certain that if [the military judge] did not previously appreciate the problems posed by such contacts, he certainly does now and will refrain from any such interactions in the future. Further, this Court has no doubt that this case will be a teaching point to all military judges and counsel . . . .

### 3. Third *Liljeberg* Factor: Confidence in the Judicial Process

The third and final *Liljeberg* factor employs a totality of the circumstances approach and requires the application of an "objective standard" to determine "whether denying a remedy . . . under the circumstances of [a] case will risk undermining the public's confidence in the military justice system." *Martinez*, 70 M.J. at 159. This factor "differs from the initial R.C.M. 902(a) inquiry" because it is not "limit[ed] . . . to facts relevant to recusal, but rather review[s] the entire proceedings, to include any post-trial proceeding, the convening authority action, the action of the [CCA], or other facts relevant to the *Liljeberg* test." *Id.* at 160.

18

With respect to this third factor, we conclude that Col Woodard did not abuse his discretion when he determined that "even if the [military judge's] actions in this case resulted in an appearance of bias, that appearance would not create an intolerable risk of undermining the public's confidence in the judicial process." As discussed with the first and second factors *supra*, the military judge's rulings and comments did not rise to a level where a reasonable person knowledgeable about all the facts would question the impartiality of the proceedings. Specifically, the military judge's rulings were within the range of reasonable options available to him. Moreover, he entertained untimely motions by defense counsel and encouraged a more robust sentencing case on behalf of Appellant. He also did not publicly display bias in front of the members, and he properly instructed the panel that during their deliberations they must disregard any appearance of bias which they may have perceived. Further, Appellant's findings and sentence were determined by a panel of members rather than by the military judge himself. The ex parte session, which constitutes the bulk of the appearance of bias claim in this case, came after the trial was complete. *See Butcher*, 56 M.J. at 93 (holding that since military judge's conduct came late in the trial, "the reversal of appellant's conviction is not required to avoid undermining the public's confidence in the judicial process"). In addition, the length of Appellant's adjudged confinement—three years—did not exceed typical sentencing parameters considering: (1) the nature and seriousness of the offense; (2) the strength of the Government's case against Appellant; and (3) the fact that he faced up to thirty-two years of imprisonment. Thus, considering the entire trial in the aggregate, it was not an abuse of discretion for Col Woodard, quoting *Uribe*, 80 M.J. at 450, to conclude that "a decision to [*reverse* the findings and sentence] would increase the risk 'that the public will lose faith in the judicial system.'"

In conclusion, we hold that Col Woodard did not abuse his discretion in determining a lack of actual bias. And although in the course of our analysis we have assumed

19

without deciding that the military judge gave the appearance of lacking impartiality, in light of the law and the facts we hold that Col Woodard did not abuse his discretion in determining that the military judge's conduct does not require reversal under the *Liljeberg* factors. Accordingly, Appellant is not entitled to relief.

## V. Judgment

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.